NOTE.

· At the same time with the case just reported was argued and adjudged another in error to the same court. It was the case of

### THE WASHINGTON UNIVERSITY *v.* ROUSE,

In which the principles of the case just decided were held applicable to an institution of learning.

IN this second case the charter was to the Washington University, an institution of learning. It was granted on the 22d of February, 1853, and by the same legislature which incorporated the Home of the Friendless on the 3d of that same February. It contained exactly the same provision about freedom of the corporation from taxation and from liability to have its charter interfered with at the discretion of the legislature, and the case came here under proceedings similar to those in the last case, and from the same court, and was argued by the same counsel, to wit:

*Mr. B. R. Curtis, for the appellant; Messrs. Dick and Blair,* contra.

Mr. Justice DAVIS delivered the opinion of the court.

There are no material points of difference between the case just decided and this case, and the views presented in that case are applicable to this. The object of the charter

in the one was to promote a charity, in the other to encourage learning. Both were public objects of advantage to the country, and which every government is desirous of promoting. Whether the endowment of a charity is of more concern to the State than the endowment of a university for learning, is within the power of the legislature to determine. If the legislature has acted in a manner to show that it considered both objects equally worthy of favor, it is not the province of this court to pass on the wisdom of the measure.

On the contrary, it is the duty of the court to carry out the intention of the legislature, if ascertainable, by applying to both charters the ordinary rules of construction applicable to legislative grants. In applying these rules to this charter, we find the existence of the same contract of permanent exemption from taxation, as in the charter of the Home of the Friendless. The State contracted in the one case as in the other, not to tax the property of the corporation, using the same words in both charters, to convey its meaning, and binding itself in the same terms, not to repeal or modify either charter in that regard. Both charters were passed by the same legislature, within a few days of each other, and neither charter is unusual in its provisions, except in this particular. The inference would, therefore, seem to be clear, that it was the legislative intention that both should, in this respect, be on an equality. The public purposes to be attained in each case constituted the consideration on which the contracts were based. The charter of the University, with its amendment (not material to notice, because not affecting this question), having been accepted, and the corporation, since its acceptance, having been actively employed in the specific purpose for which it was created, the exemption from taxation became one of the franchises of the corporation of which it would not be deprived by any species of State legislation.

It is urged that the corporation, as there is no limit to its right of acquisition, may acquire property beyond its legitimate wants, and in this way abuse the favor of the legisla-

ture, and, in the end, become dangerous, on account of its wealth and influence. It would seem that this apprehension is more imaginary than real, for the security against this course of action, is to be found in the nature of the object for which the corporation was created. It was created specially to promote the endowment of a seminary of learning, and it is not to be presumed that it will ever act in such a manner as to jeopardize its corporate rights; nor can there be any well-grounded fear that it will absorb, in its effort to establish a literary institution of a high order of merit, in the city of St. Louis, any more property than is necessary to accomplish that object. Should a state of case in the future arise, showing that the corporation has pursued a different line of conduct, it will be time enough then to determine the rights of the parties to this contract, under this altered condition of things. The present record presents no such question, and we have no right to anticipate that it will ever occur. It is enough for the purposes of this suit to say, that so long as the corporation uses its property to support the educational establishments for which it was organized, it does not forfeit its right not to be taxed under the contract which the State made with it.

We cannot see that the case of the University is distinguishable from that of the Home of the Friendless.

JUDGMENT REVERSED, and the cause remanded to the court below, with directions to proceed

IN CONFORMITY WITH THIS OPINION.

Mr. Justice MILLER, dissenting.

The CHIEF JUSTICE, Mr. Justice FIELD, and myself, do not concur in these judgments.

It is the settled doctrine of this court, that it will, in every case affecting personal rights, where, by the course of judicial proceedings, the matter is properly presented, decide whether a State law impairs the obligation of contracts; and if it does, will declare such law ineffectual for that purpose. And it is also settled, beyond controversy, that the State

legislatures may, by the enactment of statutes, make contracts which they cannot impair by any subsequent statutes.

It may be conceded that such contracts are so far protected by the provisions of the Federal Constitution that even a change in the fundamental law of the State, by the adoption of a new constitution, cannot impair them, though express provisions to that effect are incorporated in the new constitution. We are also free to admit that one of the most beneficial provisions of the Federal Constitution, intended to secure private rights, is the one which protects contracts from the invasion of State legislation. And that the manner in which this court has sustained the contracts of individuals has done much to restrain the State legislatures, when urged by the pressure of popular discontent under the sufferings of great financial disturbances, from unwise, as well as unjust legislation.

In this class of cases, when the validity of the contract is clear, and the infringement of it by the legislature of a State is also clear, the duty of this court is equally plain.

But we must be permitted to say, that in deciding the first of these propositions, namely, the validity of the contract, this court has, in our judgment, been, at times, quick to discover a contract that it might be protected, and slow to perceive that what are claimed to be contracts were not so, by reason of the want of authority in those who profess to bind others. This has been especially apparent in regard to contracts made by legislatures of States, and by those municipal bodies to whom, in a limited measure, some part of the legislative function has been confided.

In all such cases, where the validity of the contract is denied, the question of the power of the legislative body to make it necessarily arises, for such bodies are but the agents and representatives of the greater political body—the people, who are benefited or injured by such contracts, and who must pay, when anything is to be paid, in such cases.

That every contract fairly made ought to be performed is a proposition which lies at the basis of judicial education, and is one of the strong desires of every well-organized

judicial mind.   That, under the influence of this feeling, this court may have failed in some instances to examine, with a judgment fully open to the question, into the power of such agents, is to be regretted, but the error must be attributed to one of those failings which lean to virtue's side.

In our judgment, the decisions of this court, relied upon here as conclusive of these cases, belong to the class of errors we have described.

We do not believe that any legislative body, sitting under a State constitution of the usual character, has a right to sell, to give, or to bargain away forever the taxing power of the State.   This is a power which, in modern political societies, is absolutely necessary to the continued existence of every such society.   While under such forms of government, the ancient chiefs or heads of the government might carry it on by revenues owned by them personally, and by the exaction of personal service from their subjects, no civilized government has ever existed that did not depend upon taxation in some form for the continuance of that existence.   To hold, then, that any one of the annual legislatures can, by contract, deprive the State forever of the power of taxation, is to hold that they can destroy the government which they are appointed to serve, and that their action in that regard is strictly lawful.

It cannot be maintained, that this power to bargain away, for an unlimited time, the right of taxation, if it exist at all, is limited, in reference to the subjects of taxation.   In all the discussion of this question, in this court and elsewhere, no such limitation has been claimed.   If the legislature can exempt in perpetuity, one piece of land, it can exempt all land.   If it can exempt all land, it can exempt all other property.   It can, as well, exempt persons as corporations. And no hindrance can be seen, in the principle adopted by the court, to rich corporations, as railroads and express companies, or rich men, making contracts with the legislatures, as they best may, and with such appliances as it is known they do use, for perpetual exemption from all the burdens of supporting the government.

The result of such a principle, under the growing tendency to special and partial legislation, would be, to exempt the rich from taxation, and cast all the burden of the support of government, and the payment of its debts, on those who are too poor or too honest to purchase such immunity.

With as full respect for the authority of former decisions, as belongs, from teaching and habit, to judges trained in the common-law system of jurisprudence, we think that there may be questions touching the powers of legislative bodies, which can never be finally closed by the decisions of a court, and that the one we have here considered is of this character. We are strengthened, in this view of the subject, by the fact that a series of dissents, from this doctrine, by some of our predecessors, shows that it has never received the full assent of this court; and referring to those dissents for more elaborate defence of our views, we content ourselves with thus renewing the protest against a doctrine which we think must finally be abandoned.