959 P.2d 1256

**VALENCIA ENERGY COMPANY,**
Plaintiff–Appellant,

v.

**ARIZONA DEPARTMENT OF
REVENUE, Defendant-
Appellee.**

No. CV–96–0666–PR.

Supreme Court of Arizona,
En Banc.

May 19, 1998.

Ulrich Kessler & Anger P.C. by Paul G. Ulrich, David L. Abney, of counsel—and—Hartley E. Newkirk, Tucson—and—Walker Ellsworth P.L.C., Phoenix by Francis Migray—and—Newmark Irvine, P.A., Phoenix by Stephen C. Newmark, for Plaintiff-Appellant, Valencia Energy Company.

Grant Woods, Attorney General by James M. Susa, Patrick Irvine, for Defendant-Appellee, Arizona Department of Revenue.

Quarles & Brady by Michael G. Galloway, Jeffrey A. Sandquist, Phoenix, for Amicus Curiae General Motors Corporation.

## OPINION

FELDMAN, Justice.

¶1 The Arizona Department of Revenue ("Department") audited Valencia Energy Company ("Valencia") and assessed a deficiency. The court of appeals affirmed the grant of summary judgment against Valencia. We granted review to determine whether the Department can be estopped from collecting back taxes owed because a Department agent advised Valencia in writing that the activity now levied on was not subject to tax. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3) and A.R.S. § 12–102.

### FACTS AND PROCEDURAL HISTORY

¶2 We view the facts in the light most favorable to the party against whom summary judgment was granted. *Martinez v. Woodmar IV Condominiums Homeowners Ass'n, Inc.*, 189 Ariz. 206, 211, 941 P.2d 218, 223 (1997).

¶3 Tucson Electric Power Company ("TEP") built and owns a coal-fired electric plant in Springerville, Arizona, operated by Alamito Company ("Alamito").[1] On October 4, 1984, Valencia, a wholly owned subsidiary of TEP, contracted to supply Alamito's coal requirements for the Springerville plant. The agreement set the price per ton of coal, payable monthly and subject to renegotiation as needed.[2] Valencia began performance, buying the coal in New Mexico, transporting

---

1. After 1989, Alamito Company became Century Power Company.

2. Section 7 of the agreement provides:
 [T]he circumstances attendant to the providing of Coal ... are subject to variation, including, but not limited to, the amount of capital equipment which must be provided by Valencia, the cost and size of inventories necessary to assure reliable coal supply, the costs incurred or to be incurred by various coal and transportation arrangements entered into by Valencia and the recovery of interest expense by Valencia.

it to Springerville, and then preparing it for burning by Alamito.

¶4 Prior to beginning performance, Valencia questioned "the status of the business for Arizona tax purposes." Valencia's representatives met with Department officials on December 17, 1985, to ascertain what taxes would be due on Valencia's operations. Valencia thereafter corresponded with Mr. Deemer, a Department tax analyst. As a tax analyst, Deemer regularly rendered written advice to taxpayers after such advice was first cleared with his supervisor. Deemer issued three letters to Valencia. The third letter, dated January 31, 1986, stated that Valencia's transportation charges were not subject to tax. In reliance on the Department's advice, Valencia did not charge or collect transaction privilege taxes from Alamito on the transportation receipts at issue.

¶5 The Department conducted a transaction privilege tax audit of Valencia for the period November 1985 through March 1990. Although there were no pertinent, substantive changes in the Arizona statutes or Department rules during the audit period, the Department concluded that the transportation charges were subject to the transaction privilege tax. In May 1990, the Department issued a Notice of Deficiency Assessment to Valencia claiming underpayment of almost $5 million, plus interest.

¶6 After an adverse administrative decision to its challenge to the assessment, Valencia appealed to the superior court. In a published opinion, the judge presiding in the tax division of the superior court granted summary judgment in favor of the Department and denied Valencia's motion for summary judgment, upholding the assessment of back taxes and interest. *Valencia Energy Co. v. Arizona Dep't of Revenue,* 178 Ariz. 251, 872 P.2d 206 (Tax 1994).

¶7 Valencia raised numerous issues on appeal, including whether the Department was estopped from assessing back taxes because a Department agent advised that revenue from coal transportation and handling was not taxable. The court of appeals found for the Department on all issues, holding that Valencia's coal handling and transportation activities were subject to the tax. *Valencia*

*Energy Co. v. Arizona Dep't of Revenue,* 189 Ariz. 79, 938 P.2d 474 (App.1996). On the estoppel issue, the court held that Ariz. Const. art. IX, § 1, *Crane Co. v. Arizona State Tax Comm'n,* 63 Ariz. 426, 163 P.2d 656 (1945), and *Duhame v. State Tax Comm'n,* 65 Ariz. 268, 179 P.2d 252 (1947), prevent the Department from being equitably estopped by its incorrect representations that no tax was applicable. *Id.* at 84, 938 P.2d at 479 (citing *PCS, Inc. v. Arizona Dep't of Revenue,* 186 Ariz. 539, 925 P.2d 680 (App. 1995)). We granted Valencia's petition for review on the estoppel issue only.

## DISCUSSION

### A. Equitable estoppel against the Department

¶8 This case requires us to decide whether and to what extent a taxpayer may assert equitable estoppel against the Department. The Department first argues that article IX, section 1 of the Arizona Constitution, which provides that the "power of taxation shall never be surrendered, suspended, or contracted away," absolutely bars estopping the government from collecting taxes owed. Valencia and amicus argue that article IX, section 1 is inapplicable here because its purpose is only to restrict the Legislature from contracting away its power to tax.

### 1. Article IX, section 1 and *Crane Co. v. Arizona State Tax Commission*

¶9 *Crane* was the genesis of our construction of article IX, section 1 as it relates to estopping the state taxing authority. The tax commission had adopted a rule excepting from taxation certain items sold to contractors. The commission later repealed the rule, audited the taxpayer, and assessed back taxes owed on completed transactions. We recognized that the taxpayer could no longer pass the cost of the tax to its buyers but nonetheless upheld the tax and rejected the taxpayer's claim of estoppel:

> The general rule is that the state will not be estopped in the collection of its revenues *by an unauthorized act of its officers.* In the matter of collecting revenues, the state is acting in its governmental or sov-

ereign capacity, and ordinarily there can be no estoppel. Were this not the rule the taxing officials could waive most of the state's revenue. The Constitution, Art. 9, Sec. 1, provides that the power of taxation (which must of necessity include collection) "shall never be surrendered, suspended, or contracted away." To hold that the commission by regulation may waive taxes which the law required to be imposed would be violative of this provision.

The regulation of the tax commission, upon which appellant bases its plea of estoppel, was wholly unauthorized. The tax commission cannot by any rule or regulation exempt a taxpayer from the payment of a tax unless such authority has been specifically granted to it by the legislature. Here no such authority exists.

63 Ariz. at 441, 163 P.2d at 662 (emphasis added) (citations omitted).

¶ 10 Two years later, in *Duhame*, we disapproved *Crane*'s substantive holding that the sales to contractors were subject to the sales tax. With little discussion and relying on *Crane*, we again declined to apply equitable estoppel against the state taxing authorities.

It is true that during the time plaintiff was engaged in the contracting here in question he might have passed this tax on to the government had he not been misled, by an improper interpretation of the Act by the Commission, into believing no tax was due. Still, it is the settled law of the land and of this jurisdiction that as taxation is a governmental function, there can be no estoppel against a government or governmental agency with reference to the enforcement of taxes. Were this not the rule the taxing officials could waive most of the state's revenue. Therefore there is no merit to plaintiff's claim of estoppel in this case.

65 Ariz. at 281, 179 P.2d at 260. Our court of appeals has rigidly adhered to the letter of *Crane* and *Duhame*. *See, e.g., General Mo-*

*tors Corp. v. Arizona Dep't of Revenue,* 189 Ariz. 86, 938 P.2d 481 (App.1996).[3]

¶ 11 In a different context, however, we held that the corporation commission could be estopped to deny the validity of a certificate of convenience and necessity improperly issued fifty years earlier. In reaching that conclusion, we disapproved of the "no estoppel against the sovereign" rule, stating:

Whatever the basis for these exceptions to the general rule [of no estoppel], it would appear that where the application of estoppel will not affect the exercise by the state of its governmental powers and sovereignty, or bind it by unauthorized acts of its officers and employees, estoppel will, when justice dictates, be applied to the state.

*Freightways, Inc. v. Arizona Corp. Comm'n,* 129 Ariz. 245, 248, 630 P.2d 541, 544 (1981).

¶ 12 Following *Freightways*, the court of appeals distinguished *Crane* and *Duhame* to find the Department estopped because of prior incorrect representations about procedural requisites for claiming income tax deductions. If not for the procedural errors the taxpayer committed by following the Department's instructions, it was clearly entitled to the deductions as a matter of substantive law and legislative intent. *Tucson Electric Power Co. v. Arizona Dep't of Revenue,* 174 Ariz. 507, 851 P.2d 132 (App.1992). The court reasoned:

The taxpayer in this case, however, presents a very different situation. Here, the taxpayer is not relying upon estoppel to avoid the application of a taxing statute to the activities contemplated by the statute.... It is undisputed in the record presented to this court that, from a factual standpoint, the taxpayer clearly was entitled to claim the benefits of that accelerated amortization.

In advancing its estoppel argument, the taxpayer seeks to enforce, rather than avoid, the basic intent of the statute.

*Id.* at 515, 851 P.2d at 140 (footnotes omitted). Moreover, the court clarified the scope of the *Crane/Duhame* prohibition on estoppel

---

**3.** *See also State ex rel. Arizona Dep't of Revenue v. Driggs,* 189 Ariz. 74, 938 P.2d 469 (App.1996); *PCS, Inc. v. Arizona Dep't of Revenue,* 186 Ariz. 539, 925 P.2d 680 (App.1995); *Arizona Dep't of Revenue v. M. Greenberg Const.,* 182 Ariz. 397, 897 P.2d 699 (App.1995); *Knoell Bros. Const., Inc. v. State of Arizona,* 132 Ariz. 169, 644 P.2d 905 (App.1982).

in tax cases in light of *Freightways'* acknowledgment that the government could be estopped under some circumstances. The court observed:

> The central principle underlying past Arizona decisions is that the sovereign power of the state to impose taxes is vested in the legislature, and the state taxing authorities may not, *by their words or conduct,* waive the collection of taxes imposed by a valid legislative enactment.

*Id.* (emphasis added).

¶ 13 But the basic assumption on which *Crane* and its progeny were decided is questionable. *Crane* stated that estoppel was impermissible when based on the "unauthorized acts" of the taxing authority. 63 Ariz. at 441, 163 P.2d at 662. Thus the case appears to recognize the possibility of estoppel based on authorized acts but ignores the fact that the action taken by the officials in *Crane* was actually well within their authority. In *Crane,* the transaction in question was exempt from taxation under a tax commission rule. In adopting the rule, the commission exercised authority granted by statute.[4] Given that the commission's procedural action was clearly authorized, the substantive determination that no tax was due could be deemed unauthorized only because it was wrong. Thus, under *Crane* an unauthorized act means any Department decision or action later found to be incorrect under the tax statutes.

¶ 14 In sum, Arizona law governing estoppel against the Department under the *Crane* rule is quite restrictive—the Department may not be estopped based on its erroneous advice unless doing so results in substantive compliance with the tax statutes. Under this regime, the court of appeals was correct to reject Valencia's claim of equitable estoppel based on the Department's prior erroneous advice. Valencia and amicus argue, however, we should find those cases

incorrectly decided. It is to that argument we now turn.

**2. Whether article IX, section 1 was correctly applied .**

¶ 15 We begin by noting that *Crane* and *Duhame* were decided in an era when the government could do no wrong. The rigid rule forbidding estoppel against the government was a logical corollary to the previous notions of sovereign immunity. *See* John F. Conway, Note, *Equitable Estoppel of the Federal Government: An Application of the Proprietary Function Exception to the Traditional Rule,* 55 FORDHAM L. REV. 707, 709 (1987) (citing 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 17.01, at 492 (1958) ("The theory that the government cannot be estopped is no doubt a part of the broad doctrine of sovereign immunity. In the early days of the American Republic, the government was liable neither for breach of contract nor for torts of its agents. Sovereign immunity from contract and tort liability naturally carried with it sovereign immunity from equitable estoppel.")).

¶ 16 Significant changes have since occurred with respect to the sovereign immunity doctrine and, concomitantly, in our view of equitable estoppel against the government. *See Stone v. Arizona Highway Comm'n,* 93 Ariz. 384, 392, 381 P.2d 107, 112 (1963) (sovereign immunity doctrine abolished); *see also Freightways,* 129 Ariz. at 247–48, 630 P.2d at 543–44. This case provides the court with its first opportunity to examine how the abolition of sovereign immunity affects the issue of equitable estoppel against the Department.

¶ 17 Unlike numerous cases in which equitable estoppel has been asserted against various other government agencies,[5] taxation is governed by a specific constitutional provision. The parties draw clear battle lines:

**4.** Ariz.Code § 73–1333 (1939) provided:
Immediately upon this act becoming effective, the tax commission is hereby authorized and directed as a preliminary matter to the application and enforcement of this act, to formulate rules and regulations, and prescribe the forms and procedure necessary to the efficient enforcement thereof.

**5.** *See, e.g., Carondelet Health Serv. v. Arizona Health Care Cost Containment Sys. Admin.,* 187 Ariz. 467, 930 P.2d 544 (App.1996); *Rivera v. City of Phoenix,* 186 Ariz. 600, 925 P.2d 741 (App.1996); *Carlson v. Arizona Dep't of Econ. Sec.,* 184 Ariz. 4, 906 P.2d 61 (App.1995); *Outdoor Sys., Inc. v. Arizona Dep't of Transp.,* 171 Ariz. 263, 830 P.2d 475 (App.1992).

the Department contends that article IX, section 1 is an absolute ban to any interference with the state's taxation and collection activities. Valencia argues that, properly understood, the provision is irrelevant to the issue before us.

¶ 18 Article IX, section 1 is best understood in the context of the problem it addresses. In the early nineteenth century, state legislatures frequently included tax exemptions in the charters of private corporations;[6] litigation ensued over the power of subsequent legislatures to eliminate the exemptions. *See, e.g., Home of the Friendless v. Rouse*, 75 U.S. (8 Wall.) 430, 19 L.Ed. 495 (1869); *Washington Univ. v. Rouse*, 75 U.S. (8 Wall.) 439, 19 L.Ed. 498 (1869); *Rector of Christ Church v. Philadelphia County*, 65 U.S. (24 How.) 300, 16 L.Ed. 602 (1860); *Piqua Branch of State Bank of Ohio v. Knoop*, 57 U.S. (16 How.) 369, 14 L.Ed. 977 (1853); *New Jersey v. Wilson*, 11 U.S. (7 Cranch) 164, 3 L.Ed. 303 (1812). The United States Supreme Court held as early as 1812 that a state legislature's repeal of tax exemptions contracted by the state violate the Contract Clause of article I, section 10 of the United States Constitution. *See, e.g., Wilson*, 11 U.S. (7 Cranch) 164, 3 L.Ed. 303.

¶ 19 The *Dartmouth College* case subsequently established that the Contract Clause prevents a state from altering or amending terms in a private corporation's charter, unless the state's power to amend was reserved in the charter itself or in some general or special law to which it was originally subject. *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819). The Supreme Court applied this principle to protect perpetual tax exemptions granted in corporate charters. *See Home of the Friendless*, 75 U.S. (8 Wall.) 430, 19 L.Ed. 495; *Washington Univ.*, 75 U.S. (8 Wall.) 439, 19 L.Ed. 498; *Piqua Branch Bank*, 57 U.S. (16

How.) 369, 14 L.Ed. 977. The Court later acknowledged, however, that grants in a corporate charter would not be protected by the Contract Clause if a state's constitution prohibited the state from granting permanent tax exemptions. *Home of the Friendless*, 75 U.S. (8 Wall.) at 438. Accordingly, many states adopted such prohibitions in their constitutions. *See* Stewart E. Sterk & Elizabeth E. Goldman, *Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations*, 1991 WIS. L. REV. 1301, 1319 (1991) ("Once the scope of Contract Clause doctrine became apparent, a number of states adopted constitutional provisions that prohibited legislatures from contracting away taxing power.").

¶ 20 Concern for inordinate corporate influence in state affairs was particularly acute in Arizona. Professor John D. Leshy, the most prominent historian of the Arizona Constitution, described the concerns of Senator Beveridge, one of Arizona's most respected statesmen during the territorial period:

> He [Beveridge] complained bitterly that the businessmen and rich among the statehood proponents wanted nothing except continued escape from taxation, charging that the "mining corporations of Arizona have taken out ... over $400,000,000 of mineral wealth; and they have paid the Territory nothing in the way of taxes."

Leshy then concluded:

> Concern about giant corporations evading taxation had been repeatedly rehearsed in the territorial legislature to little avail, demonstrating the railroad and mining companies' strong grip on the political process. Small wonder that both contemporary reformers and historians agreed that the large corporations "reigned ... virtually untrammeled" in territorial days.

John D. Leshy, *The Making of the Arizona Constitution*, 20 ARIZ. ST. L.J. 1, 11–12 (1988).

---

6. *See, e.g.*, Tex. Const. art. VIII, § 4 (Vernon's ann. ed.) (West 1993), which provides that the "power to tax corporations and corporate property shall not be surrendered or suspended by act of the Legislature, by any contract or grant to which the State shall be a party." As the "Interpretive Commentary" explains:

Prior to 1874 when the first general incorporation statute was passed in Texas, the sole

means of incorporation was through special legislative acts creating private corporations. The desire to encourage certain industries, particularly railroads, led some of the early legislatures to include in the incorporating act a grant of partial or total tax immunity. Subsequent regret of the generosity of these earlier legislatures led to the inclusion in the Constitution of 1876, this provision. . . .

¶ 21 An examination of article IX's evolution through the 1910 Constitutional Convention confirms that the drafters of our constitution were concerned about legislative capitulation to special interests.[7] Article IX, section 1 was submitted at the convention as Substitute Proposition No. 106 and ultimately replaced numerous provisions relating to finance and taxation. One of these provisions was Proposition No. 11, "A Proposition Relative to Exemption from Taxation," which demonstrated the specific concern with grants of tax immunity to corporations:

> That none of the property of any private corporation shall ever be exempted from taxation by the State or by any political subdivision of the State, except property used solely for charitable, religious, or other eleemosynary purpose and not for profit.

On November 16, 1910, Proposition No. 11 was deemed incorporated into Proposition No. 106 and was therefore abandoned. *See* THE RECORDS OF THE ARIZONA CONSTITUTIONAL CONVENTION OF 1910, at 406 (John S. Goff ed.). Section 4 of Proposition No. 106 provided:

> The power to tax corporations and corporate property shall not be surrendered or suspended by any contract or grant to which the state shall be a party.

On November 16, the Committee on Public Debt, Revenue and Taxation recommended an amended Proposition No. 106, which ultimately became article IX of the constitution. *See id.* at 405. The revised section on the power of taxation, now article IX, section 1, commanded that the "power of taxation shall never be surrendered, suspended, or *contracted* away." (Emphasis added.)

¶ 22 Almost forty years ago, we reviewed the framers' intent with respect to Proposition No. 106 and article IX, section 1. In determining whether the clause prohibited the City of Phoenix from committing the proceeds of a fuel tax to repay road repair bonds, Justice Struckmeyer thoroughly examined the Minutes of the Constitutional Convention, noted that the provision was inserted in our constitution to address the *Dartmouth College* problem, and concluded:

> Thus, it becomes apparent that the first sentence of Substitute Proposition No. 106, now Art. IX, § 1, was adopted for the purpose of restricting the legislature's right to alienate the power to tax anything and all persons. The prohibition is against the irrepealable grant of immunity from taxation. . . .
>
> Therefore, we are of the opinion that the first sentence of Art. IX, § 1 is a prohibition against the surrender or relinquishment of the right to impose a tax.

*Switzer v. City of Phoenix*, 86 Ariz. 121, 127–28, 341 P.2d 427, 431 (1959).[8]

¶ 23 From the foregoing we conclude that the purpose of article IX, section 1 was to void grants of tax immunity that would otherwise become permanent under article I, section 10 of the federal constitution as interpreted in the *Dartmouth College* case. Accordingly, this provision of our state constitution prohibits *the Legislature and state agencies* from alienating the Legislature's *fundamental power* to tax.

¶ 24 This understanding of the purpose of article IX, section 1 casts a different light on the Department's claim. The Department maintains that article IX, section 1 restrains all branches of government, not just the Legislature, and its purpose is to prevent any waiver of taxes due. The foregoing discussion illustrates that the Department is correct on the first assertion but

---

**7.** Article IV, section 23 also evinces the framers' serious concern with undue corporate influence in politics:

> It shall not be lawful for any person holding public office in this state to accept or use a pass or to purchase transportation from any railroad or other corporation, other than as such transportation may be purchased by the general public. . . .

Commenting on this provision, Professor Leshy observed that it "reflects the framers' preoccupation with potential governmental corruption by corporations, a realistic concern given the political dominance, exercised by means fair and foul, of large railroad and mining corporations during the territorial period." JOHN D. LESHY, THE ARIZONA STATE CONSTITUTION: A REFERENCE GUIDE 123 (1993).

**8.** Because we believe all of Justice Struckmeyer's discussion is worth reading, we have reprinted it in the Appendix.

wrong on the second. Article IX, section 1 restrains all branches of government, but only as to relinquishment of the Legislature's fundamental power to tax. An estoppel from collecting revenue from a single taxpayer for a .single event is not the kind of permanent capitulation with which the framers were concerned. We therefore hold that article IX, section 1 is not an absolute ban to estopping the Department.[9]

### 3. Separation of powers

¶ 25 The Department raises a separation of powers challenge under article III of the Arizona Constitution, arguing that "enforcement of estoppel in tax cases deprives the legislature of the power to make the law and the judiciary the power to interpret it." Following the demise of the state-can-do-no-wrong doctrine, the no-estoppel-against-the-government rule has been most commonly justified on separation of powers principles.[10] Article IX aside, our cases have long recognized the limitations imposed by article III on exercising judicial power in tax matters. *See, e.g., Tanque Verde Enter. v. City of Tucson*, 142 Ariz. 536, 691 P.2d 302 (1984) (the judiciary would usurp legislative function by striking down even excessive revenue-raising taxes). While *Freightways* held that estoppel may lie against the government, we have yet to consider the effect of separation of powers in such a case.

¶ 26 "Nowhere in the United States is this system of structured liberty [separation of powers] more explicitly and firmly ex-pressed than in Arizona." *Mecham v. Gordon*, 156 Ariz. 297, 300, 751 P.2d 957, 960 (1988). Article III of our constitution provides:

> The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others.

¶ 27 The Department presents several arguments. Estopping the Department, it contends, violates separation of powers by (1) binding the Legislature and thus the state's taxing authority through the unauthorized act of an executive branch officer, (2) effectively permitting an executive agent to legislate with respect to taxpayers who relied on the agent's statements, and (3) precluding the judiciary from declaring the existing law.

¶ 28 On the first point, Valencia responds that because the Department is statutorily authorized to give tax advice,[11] and occasional erroneous advice is foreseeable and unavoidable, mistakes are impliedly if not explicitly authorized. While *Crane* seems to define unauthorized acts as any Department interpretation later found to be incorrect under the tax statutes, this definition does not comport with more recent decisions. In *Freightways*, we found the corporation commission estopped from denying the validity of a motor carrier certificate

9. The Legislature seems to have reached the same conclusion. In A.R.S. § 42–139.21(C), effective September 21, 1991, the Legislature effectively overruled *Crane* and *Duhame*.

10. Frederick S. Kuhlman, Comment, *Governmental Estoppel: The Search for Constitutional Limits*, 25 Loy. L.A. L. Rev. 229, 229 (1991) ("Separation of powers has emerged as the linchpin on which the government estoppel debate turns."); Deborah Walrath, Note, *Estopping the Federal Government: Still Waiting for the Right Case*, 53 Geo. Wash. L. Rev. 191, 192 (1985) ("[E]stoppel traditionally does not lie against the government. This distinction arose largely as a corollary to the doctrine of sovereign immunity that 'the King can do no wrong.' ... As Congress has passed legislation waiving sovereign immunity and allowing the government to be sued in limited circumstances, the power of this traditional ra-tionale has diminished. One justification frequently invoked to support governmental exemptions from equitable estoppel is the separation of powers doctrine.").

11. A.R.S. § 42–104(A)(6) provides:

A. The department shall administer and enforce the provisions of this title, title 43 and other laws assigned to it and has all the powers and duties prescribed by law for such purposes. In all proceedings prescribed by law the department may act on behalf of this state. In addition, the department shall:
 * * *
6. Provide information and advice within the scope of its duties subject to the laws on confidentiality of information and departmental rules adopted pursuant to such laws.

issued without complying with statutory requirements because the commission had recognized the validity of the certificate for over fifty years. 129 Ariz. at 248, 630 P.2d at 544. The Legislature authorized the commission to issue certificates, but through deliberate error or oversight it issued Freightways' certificate contrary to the law's requirements.[12] We applied estoppel, concluding it would not "affect the exercise by the state of its governmental powers and sovereignty, or bind it by the *unauthorized acts* of its officers or employees...." *Id.* at 248, 630 P.2d at 544 (emphasis added). Thus the *Freightways* court found that the act of issuing a certificate, something the commission was authorized to do by statute, did not become unauthorized simply because the act was performed erroneously. This changed definition of unauthorized was used and applied by the court of appeals in *Tucson Electric Power*, 174 Ariz. at 516 n. 9, 851 P.2d at 141 n. 9.[13] Even if incorrect, the acts of the Department in this case, like those of the commission in *Freightways* and the Department in *Tucson Electric Power*, were within the general parameters of the government agent's authority. Thus, the *Crane* definition of unauthorized acts is not only patently illogical but has been effectively modified. We adopt and apply the view taken in *Freightways* and *Tucson Electric Power.* The advice given Valencia was wrong but not so unauthorized as to violate separation of powers.

¶ 29 The Department next argues that estoppel in these circumstances effectively permits an executive agency to change the law, which constitutes a usurpation of legislative power. This argument fails to recognize that the law and its execution are separate and distinct spheres. *See, e.g., Salt River Pima–Maricopa Indian Community v. Hull,* 190 Ariz. 97, 104, 945 P.2d 818, 825 (1997) ("The Legislature, in the exercise of [its] lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect. Once the Legislature has acted, however, it becomes the duty of the Executive to 'take care that the laws be faithfully executed.' ") (citing *Rios v. Symington,* 172 Ariz. 3, 12, 833 P.2d 20, 29 (1992)). The axiom that an administrative agency such as the Department must execute the law as it is written does not lead to the result that the Department asserts here. Estopping the Department from assessing a tax does not work any change in the law but impacts only its execution. If the Department's absolutist interpretation were true, then the constitution would be similarly violated whenever the Department exercises its discretion to enter into closing agreements [14] or to abate balances owed.[15] These provisions, like the operation of estoppel against the Department, involve administration of the law not its creation. The legislative prerogative to tax was not impaired.

¶ 30 We turn, then, to the contention that judicial recognition that the Department is estopped from correcting its prior, erroneous interpretation of law operates as a retroactive concession of judicial power, enabling the Department to make determina-

---

**12.** Freightways submitted two applications for a certificate: one a renewal filed after a deadline imposed by commission rule, and the other an original application that, by statute, would have required a hearing before being granted. *Id.* at 246, 630 P.2d at 542. It is unclear which application was acted upon in issuing the certificate, but it is irrelevant for our purposes because issuance of the certificate under either circumstance contravened statutory requirements. *See Tucson Warehouse & Transfer Co. v. Al's Transfer, Inc.,* 77 Ariz. 323, 327, 271 P.2d 477, 479–80 (1954) ("The rule is that general rules and regulations of an administrative board or commission prescribing methods of procedure have the effect of law and are binding on the Commission and must be followed by it so long as they are in force and effect.").

**13.** The court of appeals explained in a footnote:

While the audit supervisor's representations were "unauthorized" in the sense that they were contrary to the provisions of the statute as we have interpreted it, there is no evidence that he was not *acting within the general parameters of his authority.* Therefore, under appropriate circumstances otherwise supporting the application of estoppel, his representations would be binding on the state.

*Id.* (emphasis added).

**14.** *See* A.R.S. § 42–139.06.

**15.** *See* A.R.S. § 42–104(B).

tions immunized from judicial revision. Thus, the argument goes, the Department would effectively be exercising the powers properly belonging to the judiciary, in violation of article III of our constitution. We do not find a separation of powers violation based on such an attenuated notion. Estoppel is a judicial doctrine. Its application by the courts can hardly be construed as placing judicial power in the hands of the executive branch. While estoppel protects the Department's prior incorrect interpretation of the law from further judicial review in a particular case, it does not give the Department the judicial power to interpret the law in any case before the court. Nor does it give the Department the authority to determine when, where, or in what situation estoppel should be recognized. Judicial application of estoppel does nothing more than preclude the Department from arguing the substantive issue of law in the first place. The court remains the final arbiter of the law; it alone decides the correct interpretation of the law and whether estoppel will nevertheless apply in a given case.

¶ 31 Thus, we conclude that neither article III nor article IX, section 1 of the constitution prohibits equitable estoppel against the Department. We must then consider whether circumstances exist in this case that could warrant the application of estoppel against the Department.

### 4. Factual predicate for equitable estoppel against the Department

¶ 32 That the constitution does not prohibit estoppel against the Department does not necessarily mean that the Department will be estopped. Estoppel sounds in *equity* and will therefore not apply to the detriment of the public interest. *Spur Indus., Inc. v. Del E. Webb Dev. Co.,* 108 Ariz. 178, 184, 494 P.2d 700, 706 (1972) ("the courts have long recognized a special responsibility to the public when acting as a court of equity"). Accordingly, we look carefully to the underlying considerations that traditionally have been advanced for and against the application of estoppel against the Department.

¶ 33 Even the cases applying estoppel against the government have recognized that

"equitable estoppel . . . generally may not be invoked against the sovereign." *Freightways,* 129 Ariz. at 246, 630 P.2d at 542. We said the government may be estopped only when its "wrongful conduct threatens to work a serious injustice and . . . the public interest would not be unduly damaged. ... ." *Id.* at 248, 630 P.2d at 544. Despite our holding in *Freightways,* however, estoppel has remained all but prohibited as against the Department under the *Crane/Duhame* line of cases.

¶ 34 We recognize the fundamental importance of the state's taxing power but believe the state's obligation to treat its citizens justly is as essential to the existence of government as the Legislature's power to levy taxes. *See, e.g., Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 172 n. 19, 71 S.Ct. 624, 649 n. 19, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) (quoting 5 THE WRITINGS AND SPEECHES OF DANIEL WEBSTER 163) ("In a government like ours, entirely popular, care should be taken in every part of the system, not only to do right, but to satisfy the community that right is done."). Moreover, as our tax system relies primarily on the good faith of citizens to self report, it is imperative that the system itself manifest fairness by requiring that all citizens contribute their fair share. But it is patently unjust to permit the erroneous advice of the government to cause detriment beyond the tax itself. There is no justice, one might say, if the government can punish its citizens for following its instructions. We therefore join the many states permitting equitable estoppel against the government in tax matters. *See, e.g.,* Michael A. Rosenhous, Annotation, *Estoppel of State or Local Government in Tax Matters,* 21 A.L.R.4th 573 (collecting cases). We overrule *Crane* and *Duhame* and hold that equitable estoppel may lie against the Department under certain limited circumstances.

¶ 35 The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudi-

ation of its prior conduct.[16] *See, e.g., Tucson Electric Power*, 174 Ariz. at 516, 851 P.2d at 141. In light of the serious considerations implicated by the taxing power, we examine these elements as they apply to the Department in this case.

¶ 36 The first element requires affirmative acts inconsistent with the position later relied on. Common sense tells us that the evidentiary burden in cases such as the present would require that the state's action bear some considerable degree of formalism under the circumstances. An off-the-cuff opinion, for example, will not suffice if the question presented requires a measure of research or deliberation. It is rare that satisfactory evidence of an absolute, unequivocal, and formal state action will be found unless it is in writing. In addition, the action must be taken by or have the approval of a person authorized to act in the area under consideration. *See Freightways*, 129 Ariz. at 248, 630 P.2d at 544. In general, the state may not be estopped due to the casual acts, advice, or instructions issued by nonsupervisory employees.[17]

¶ 37 The second requirement demands both that the party claiming estoppel actually relied on the state's act and that such reliance was reasonable under the circumstances. Actual reliance means that the party seeking estoppel has the burden to demonstrate that it prospectively relied on the state action. That the reliance be reasonable requires, among other things, that the party seeking estoppel have acted in good faith by providing the state with correct information and neither knew nor was put on notice that the state's position was erroneous. *See Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 60, 730 P.2d 235, 237 (1986). In general, "reliance should be considered reasonable if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *Freightways*, 129 Ariz. at 247, 630 P.2d at 543; *see also Bohonus v. Amerco*, 124 Ariz. 88, 90, 602 P.2d 469, 471 (1979) ("As a general rule, it is essential to the existence of an estoppel that the representation be relied upon and that such reliance be justifiable. Reliance is not justified where knowledge to the contrary exists."); *Suburban Pump & Water Co. v. Linville*, 60 Ariz. 274, 283, 135 P.2d 210, 214 (1943) (One who acts "with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss cannot invoke the doctrine of estoppel.").

¶ 38 The third requirement is that there be substantial detriment to the party resulting from a repudiation of prior representations. As asserted against the Department, detriment requires a positional change not compelled by law. Thus, no detriment is incurred when the party's only injury is that it must pay taxes legitimately owed under the correct interpretation of the law. Nor will liability for non-punitive interest on the tax legitimately due constitute detrimental reliance. *State ex rel. Arizona Dep't of Revenue v. Driggs*, 189 Ariz. 74, 938 P.2d 469 (App.1996). Non-punitive interest

---

16. The Department argues that *Freightways* promulgated a four-prong standard that governs estoppel against the government. In *Freightways*, we cited a federal case holding that the elements of estoppel were "(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." 129 Ariz. at 246, 630 P.2d at 542 (citing *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104, (9th Cir.1960)). We note that this four-prong test was not expressly adopted in *Freightways*. More important, the test cited in *Freightways* is, in substance, no different than the three-prong test traditionally applied in Arizona.

17. We note that an additional standard has been enunciated by our court of appeals. In *Carlson v. Arizona Dep't of Econ. Sec.*, the court of appeals discussed the wrongful conduct element of an estoppel claim against the government, finding that estoppel will lie against the state only if the government's actions constitute "affirmative misconduct." 184 Ariz. 4, 6, 906 P.2d 61, 63 (App.1995). *Carlson* distinguished between mere neglect or oversight and more egregious intentional or willful conduct. *Id.* at 8, 906 P.2d at 65. The affirmative misconduct standard adopted in *Carlson* may conflict with *Freightways*.

is, after all, nothing more than compensation for the use of money. *See, e.g., Dingle v. Prudential Prop. & Cas. Ins. Co.*, 85 N.Y.2d 657, 628 N.Y.S.2d 15, 651 N.E.2d 883, 885 (1995). The taxpayer had the benefit of using the funds before paying the tax claim and, in the legal sense, suffers no loss by reason of paying interest on the money it retained in its possession.

¶ 39 A federal decision is illustrative on the question of detriment. In *Schuster v. Commissioner*, the Internal Revenue Service assessed a tax deficiency against Schuster, the surviving beneficiary, and the trustee bank, claiming that it erred in an earlier audit determination that the corpus of a trust was not a taxable part of the decedent's estate. Schuster was thus liable for the tax that would have been due if the audit had been correctly performed, and the bank, which had distributed the entire corpus, was by statute jointly and severally liable. 312 F.2d 311, 318 (9th Cir.1962). The United States Court of Appeals held that the IRS was estopped against the bank but not against Schuster:

> We are unaware of any particular detriment sustained by Schuster in reliance on the Commissioner's mistake, for she did not materially change her position in reliance on his earlier determination. But the Bank has been greatly prejudiced because of the Commissioner's mistake. After it was informed that the trust corpus was not includable in the decedent's gross estate, it distributed the corpus to the beneficiary, and thus no longer retains the property which was the subject of the deficiency. Therefore, any liability of the Bank would have to come out of its own pocket, not the corpus of the trust. This would be grossly unfair to the Bank, especially because it never enjoyed the use of the corpus but merely acted in the capacity of a trustee. It is difficult to see what additional action the Bank might have taken to protect itself from liability, faced with the beneficiary's demand for the corpus and the Commissioner's determination that it was not tax-

able. It is our conclusion that the Bank's equitable interest is so compelling, and the loss which it would sustain so unwarrantable, as to justify the application of the estoppel doctrine against the Commissioner.

*Id.* Thus, a detriment must involve some collateral loss other than payment of the tax due under the law as properly interpreted. We note that this is precisely the type of detriment alleged in *Crane* and *Duhame*,[18] and had the law then recognized estoppel against the Department, the detriment may have been sufficient.

 ¶ 40 Finally, all these requirements are conditioned by the general rule that estoppel may apply against the state only when the public interest will not be unduly damaged and when its application will not substantially and adversely affect the exercise of governmental powers. *Freightways*, 129 Ariz. at 248, 630 P.2d at 544. This rule requires prudence in the application of estoppel, recognizing that the state's solvency is of paramount importance and that equity will not sacrifice the fundamental welfare of the whole community to accomplish justice for the individual. *See, e.g., Trull Nursing Home, Inc. v. Maine Dep't of Human Serv.*, 461 A.2d 490, 499 (Me.1983) ("Estoppel against the government should be 'carefully and sparingly applied,' especially where application would have an adverse impact on the public fisc.") (citations omitted).

¶ 41 We believe the court's comments in *Schuster* are appropriate here:

> We recognize the force of the proposition that estoppel should be applied against the Government with utmost caution and restraint, for it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the acts and conduct of particular officials in their relations with particular individuals. Estoppel has been applied against the Commissioner in limited situations, but they have usually arisen where

---

**18.** "It is true that during the time plaintiff was engaged in the contracting here in question he might have passed this tax on to the government had he not been misled, by an improper interpre-

tation of the Act by the Commission, into believing no tax was due." *Duhame*, 65 Ariz. at 281, 179 P.2d at 260 (citing *Crane*).

the Commissioner's act involved matters of a purely administrative nature. Indeed the tendency against Government estoppel is particularly strong where the official's conduct involves questions of essentially legislative significance, as where he conveys a false impression of the laws of the country. Obviously, Congress's legislative authority should not be readily subordinated to the action of a wayward or unknowledgeable administrative official. Accordingly, the general proposition has been that the estoppel doctrine is inapplicable to prevent the Commissioner from correcting a mistake of law.

But we regard this proposition as one of general application, not as embracing the concept that the Commissioner might always correct a legal mistake regardless of the injustice which will result. It is conceivable that a person might sustain such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair play, that the Commissioner not be allowed to inflict the injury. It is to be emphasized that such situations must necessarily be rare, for the policy in favor of an efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context. But as long as the concept of estoppel retains any validity, it is conceivable that such situations might arise.

312 F.2d at 317 (citations omitted). Such a situation arose in *Schuster*, and Valencia claims it made a similar case here.

## B. Valencia's claim of equitable estoppel

¶ 42 Valencia claims it advanced sufficient facts to justify vacating the tax court's grant of summary judgment in favor of the Department and to require that its cross-motion for summary judgment be granted.

### 1. Affirmative acts inconsistent with a claim later relied on

■ ¶ 43 The Department does not dispute that Deemer, its tax analyst, stated in his January 31, 1986, letter to Valencia that transportation charges were not subject to tax. To Valencia, the letter could have appeared to be the Department's official, unequivocal position on the question. If Valencia is correct on its facts, the letter was sufficient at best to create a genuine issue that the state had acted and taken a position inconsistent with its later claim that the transaction was taxable.

### 2. Action by a party reasonably relying on such conduct

■ ¶ 44 Valencia asserts that it reasonably relied on the Department's statements that the coal transportation activities were not subject to the transaction privilege tax. The Department concedes that relying on the Department's statements, Valencia did not collect the tax from its customer,[19] but it argues that Valencia's reliance was not reasonable. The Department argues that Valencia, a sophisticated business enterprise, should have known that Deemer's advice was wrong, or at least suspect. The Department issued three letters to Valencia. The Department asserts that the first was patently incorrect, the second stated concepts Valencia should have recognized as patently erroneous, and the third, advising that no tax applied and written after Valencia provided additional information, stated the same erroneous concepts as the second.[20] The Depart-

---

19. While the Department expressly concedes that Valencia relied on Deemer's advice, the Department also points out in a footnote facts that indicate otherwise. The Department implies that because Valencia had already sold over $60 million of coal by January 31, 1986, Deemer's letter did not cause Valencia's reliance. These facts, if true, present a genuine issue on the question of whether Valencia actually relied. *See Virginia v. Washington Gas Light Co.*, 221 Va. 315, 269 S.E.2d 820, 826 (1980).

20. The Department also argues that the third letter is facially incorrect because it states with respect to transportation of the coal that "'[t]itle passes in New Mexico'—which is clearly wrong because the sale of coal to Alamito occurs in Arizona at the power plant.'" However, Valencia responded in its motion papers that title to the coal passed *from the mine to Valencia* in New Mexico, and therefore the letter was not facially incorrect. We only note here that the focal point of the inquiry is not whether the letter was facially incorrect but whether the facts are such that the party asserting estoppel could not have reasonably relied on them.

ment also argues that queries posed by Valencia's accountants, who worried that too little tax was being collected, should have put Valencia on notice that Deemer's letter was incorrect.

¶ 45 We cannot say as a matter of law that Valencia acted with "careless indifference to means of information reasonably at hand or ignore[d] highly suspicious circumstances which should warn . . . of danger or loss. . . ." *Suburban Pump & Water Co.*, 60 Ariz. at 284–85, 135 P.2d at 214. Valencia met with Department officials and made three separate inquiries regarding whether the tax applied. They were finally advised the transaction was not taxable. The fact that Valencia's accountants questioned why receipts did not reflect a greater amount of tax does not conclusively establish that Valencia should have known something was amiss because the accountants' inquiries occurred after Valencia received Deemer's letter. We cannot say it was unreasonable as a matter of law for Valencia to disregard the accountants' questions in light of the Department's stated position. Nor does the fact that the letters contained references to irrelevant concepts necessarily mean that the Department's position was patently incorrect. On the record before us, which contains none of Valencia's communications with the Department, it is not clear why such references were made. It is clear that Valencia struggled to obtain the Department's position and provided information to the Department for that purpose. On the present record, there exists a genuine question of fact whether the errors in the Department's letters gave Valencia information that made reliance unreasonable.

¶ 46 Of course, Valencia's reliance would not have been reasonable if the law clearly precluded its theory of nontaxability. Valencia is a sophisticated taxpayer, no doubt advised by in-house and private counsel and accountants. We assume it approached the Department with considerable knowledge and understanding of the law. Were it clear that the business operations in question were subject to tax, Valencia could not in good faith assert reliance on an erroneous Department interpretation. In this connection, the

Department asserts that the statute clearly imposes the tax, common sense confirms that result, and the case law is unequivocal.

¶ 47 The statutes provide that a "transaction privilege tax" is imposed on "the volume of business transacted by persons on account of their business activities. . . ." A.R.S. § 42–1306(A) & (C). The tax applies to "the business of selling tangible personal property at retail." A.R.S. § 42–1310.01(A) (Supp. 1995). The tax base for the sale of retail goods is "the gross proceeds of sales or gross income derived from the business." *See Arizona State Tax Comm'n v. Garrett Corp.*, 79 Ariz. 389, 390, 291 P.2d 208, 209 (1955).

¶ 48 Valencia argues, however, that the coal transportation and handling operations were nontaxable services separate and distinct from the taxable sales. "Services rendered in addition to selling tangible personal property at retail" are not subject to the sales tax. A.R.S. § 42–1310.01(A)(2). Therefore, the dispositive legal issue was whether it was reasonable to think that Valencia's transportation and handling operations could be deemed services separable from the sales for tax purposes.

> Where it can be readily ascertained without substantial difficulty which portion of the business is for non-taxable professional services . . ., the amounts in relation to the company's total taxable Arizona business are not inconsequential, and those services cannot be said to be incidental to the contracting business, the professional services are not merged for tax purposes into the taxable contracting business and are not subject to taxation.

*State Tax Comm'n v. Holmes & Narver, Inc.*, 113 Ariz. 165, 169, 548 P.2d 1162, 1166 (1976).

¶ 49 Thus, to be considered separable, the activities must be (1) easily ascertainable, (2) not inconsequential, and (3) not incidental to the taxable activity. Valencia maintains that the transportation and handling charges were accounted for separately, were substantial in that they comprised nearly one-half of the business, and were not incidental to the sales activities. It also argues that transpor-

tation was both inseparable from and interwoven with the principal business.

¶ 50 We did not grant review of Valencia's challenge to the court of appeals' ruling on the substantive issue of whether the transportation and handling operations were subject to tax. We therefore consider only whether Valencia's position was reasonable in light of the circumstances. The court of appeals' opinion is instructive on this issue. The court acknowledged that "Valencia might have been able to avoid taxation of the services by selling coal separately from the services." 189 Ariz. at 83 n. 5, 938 P.2d at 478 n. 5. However, the court held that the transportation and handling charges were not separate from the sales, primarily because Valencia had not entered into separate sales and transportation contracts and had failed to separately bill for those charges. *Id.* at 83, 938 P.2d at 478. But as the court of appeals' opinion indicates, it is possible to structure a transaction in such a manner as to avoid the tax. *Id.* at 83 n. 5, 938 P.2d at 478 n. 5. On this record, therefore, we conclude that Valencia could have believed that it had taken sufficient measures to structure its transaction, as confirmed by Deemer's letter. In hindsight, Valencia's position was wrong, but we cannot say it was unreasonable as a matter of law. That question can be resolved only by the tax court.

■■■ ¶ 51. The Department also argues that it is inappropriate to apply estoppel in this case because, while the Department's answer to Valencia's inquiries is clearly presented in Deemer's letters, the inquiries themselves have yet to be disclosed. As the Department said in response to Valencia's petition for review, to "simply read the 'answer' without knowing the 'question' is of dubious value." No doubt this is true, but for summary judgment purposes, Valencia's factual statements are sufficient to raise a genuine issue of material fact. We note, however, that the facts, though not Valencia's conclusions, may be germane and even necessary to prove Valencia acted in good faith when dealing with the Department. Equitable estoppel will not apply in favor of a party that has misled or deceived the government into making erroneous representations. As

Justice Holmes observed long ago, "Men must turn square corners when they deal with the Government." *Rock Island, Arkansas & Louisiana R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920).

■■■ ¶ 52 Finally, the Department contends Valencia did not follow Deemer's advice, which assumed that the transportation, sales, and handling operations would be segregated in Valencia's records *and invoices.* The Department contends there was no segregation, but Valencia argues the charges were segregated when the invoices were read in light of a tariff sheet. Again, a genuine issue of material fact exists.

### 3. Injury to Valencia resulting from reliance on the state's conduct

¶ 53 Valencia presented affidavits stating that the tax would have been passed on to the customer but for reliance on the Department's advice. The Department concedes that "Valencia did not collect the tax that it could have [from its customers] because it relied upon the Department's advice...." Therefore, we only note here that the detriment incurred was substantial (about $5 million, not including interest) and exceeded the mere payment of a tax owed in that Valencia lost the opportunity for recoupment from its customer.

### 4. The public interest

■■■ ¶ 54 Finally, we observe that on this record estopping the Department does not threaten undue damage to the public interest, nor will the application of estoppel substantially and adversely affect the exercise of governmental powers. The state's solvency has not been threatened by its inability to collect this particular tax liability, now eight years past due, from this single taxpayer. Moreover, in this case estoppel only applies retroactively to the transactions completed by Valencia; it does not impair the state from exercising its authority prospectively. Thus, there is no substantial and adverse effect on the state's taxing power.

## CONCLUSION

¶ 55 We hold that recognition of the doctrine of equitable estoppel against the Department of Revenue in tax cases is not precluded by either article IX, § 1 or article III of the Arizona Constitution. *Crane* and *Duhame* are accordingly overruled insofar as they hold to the contrary. A taxpayer may establish the affirmative defense of estoppel against the Department of Revenue by proving the Department's conduct was inconsistent with a position later assumed, the taxpayer relied and had a right to rely on the Department's conduct, and the taxpayer therefore sustained damage that would make it unjust to allow the Department to maintain the later-taken position.

¶ 56 On the record before us, we are unable to affirm or direct the grant of summary judgment to either party. Therefore, the court of appeals' opinion is vacated insofar as it conflicts with this opinion, the tax court's opinion is vacated, its judgment is reversed, and the case is remanded to the tax court for further action consistent with this opinion.

ZLAKET, C.J., JONES, V.C.J.,
MARTONE and MOELLER (Retired), JJ.,
concur.

## APPENDIX

In discussing the background of article IX, section 1, Justice Struckmeyer said:

This proposition [Substitute Proposition No. 106] came before the Convention for discussion on Saturday morning, November 19, 1910. At that time, the Honorable George W.P. Hunt, who later became the seven-time Governor of Arizona, said:

In regard to that first section. The Committee on Taxation had a memorial gotten up by the Tax Association composed of men all over the United States who have made this a study for years, and I have on my desk here letters from nearly every professor on economics in all the universities of the country, from Harvard, in Massachusetts to Stanford, in California, and they are for anyone who wants to look at these letters. They one and all believe this is the only way to put this in the constitution, and if the members of the convention will allow me to read them a letter from Washington, which is a sample of the letters I have received, it will throw some light on the subject. It is from J.E. Frost, President of the State Board of Tax Commissioners of the State of Washington, at Olympia, Washington....

Dear Sir: I am just in receipt of a letter from the Hon. Allen R. Foote, of Columbus, Ohio, President of the International Tax Association, asking me to express to you my views on the subject of constitutional provisions relative to taxation.

\* \* \*

The right to impose taxes is a legislative power, inherent in organized government. In the absence of constitutional limitations, a legislature may enact such tax laws as it sees fit, subject only to the restrictions contained in the constitution of the United States. Everything over which the authority of the state reaches may be the subject of taxation, whether it be person, property, or occupation.

\* \* \*

There are certain safeguards, however, that should be provided: First; the legislature should be prohibited from contracting away the right to tax anything or person whatsoever, or from making any irrepealable grant of exemption.

\* \* \*

From the content of the letter, it can be gleaned that since the legislature should be prohibited from contracting away the right to tax, the Convention intent was to accomplish the converse; that is, that the legislature would have the right to tax anything and all persons whatsoever. Viewed in this light, it would appear that by the use of the words "power of taxation," the Convention meant "the power to impose taxes."

The complete text of the Memorial referred to in the statement by the Honorable George W.P. Hunt can be found in the

report of State and Local Taxation, 5th National Conference of the National Tax Association held in Richmond, Virginia, September, 1911, pp. 451 through 457. A reading of the Memorial leads us to the conclusion that the language contained in the first sentence of Art. IX, § 1 was designed to leave legislators unencumbered in so far as their power to impose taxes. We note also from the report of the Third Conference of the same Association, p. 88, that one M.H. Carver of the Louisiana State Tax Commission is quoted as stating:

> There is little necessity for putting anything at all in the constitution about taxation, and some distinguished authorities hold that everything on the subject in a constitution is dangerous. To meet the decision of the Supreme Court of the United States, though, in the *Dartmouth College* case [*Trustees of Dartmouth College v. Woodward*], 4 Wheat. 518, [4 L.Ed. 629], it is well to provide: "That the power of taxation shall never be suspended, surrendered or contracted away...."

*Id.* at 126–27, 341 P.2d at 430–31 (footnote omitted).