IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JACK CROSS, *Plaintiff/Appellee*,

*v.*

ELECTED OFFICIALS RETIREMENT PLAN; JAMES M. HACKING,
Administrator of the Elected Officials Retirement Plan,
*Defendants/Appellants.*

No. 1 CA-CV 12-0884
FILED 05-15-2014

Appeal from the Superior Court in Maricopa County
LC2010-000984-001
The Honorable Crane McClennen, Judge

**REVERSED; REMANDED**

COUNSEL

Keller Rohrback PLC, Phoenix
By Ron Kilgard
*Counsel for Plaintiff/Appellee*

Kutak Rock, LLP, Scottsdale
By Michael W. Sillyman, Paige A. Martin
*Counsel for Defendants/Appellants*

**OPINION**

Chief Judge Diane M. Johnsen delivered the opinion of the Court, in
which Presiding Judge Peter B. Swann and Judge Donn Kessler joined.

**J O H N S E N,** Judge:

¶1          The Elected Officials Retirement Plan appeals the superior court's judgment overturning the Plan's decisions to reduce the pension benefits of its former Administrator and to suspend his pension altogether until it could recoup some $600,000 in purported overpayments.  For the following reasons, we reverse the judgment in part and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶2          The Plan is a statutory public retirement plan for elected officials.  Arizona Revised Statutes ("A.R.S.") sections 38-801(15) (2014), -804(A) (2014).[1]  It was created in 1985, pursuant to 1985 Laws Ch. 309 § 4, and is now codified at A.R.S. §§ 38-801 through -822 (2014).

¶3          As Administrator of the Plan, Jack Cross was the only member of the Plan not an elected official.  On June 30, 2002, after 20 years of credited service, Cross filed an application for retirement and began accepting a monthly pension.  Cross's base salary in fiscal years 2000, 2001 and 2002 was $133,452, $141,136 and $164,633, respectively.  His pension was calculated based on an "average annual salary" of $205,580, which included his base salary, bonuses and payments for unused vacation and sick time.  Despite his purported retirement, however, Cross continued on as the Plan's Administrator for two years, performing the same duties and earning the same base salary.  He was paid $175,000 in fiscal year 2003 and $325,691, including bonus and pay for unused vacation and sick time, in fiscal year 2004.  Cross again retired on June 30, 2004, and finally separated from State employment.

¶4          For several years thereafter, the Plan paid Cross a monthly pension of $13,705.  In 2010, after a settlement in unrelated litigation caused the Plan to agree to recalculate pensions based on some members' final year of service, rather than their final three years, Cross asked the Plan to recalculate his pension.  In response, the Plan informed Cross it had discovered it had paid him too much in pension benefits.  According to the Plan, Cross was not eligible to receive any pension until he finally "cease[d] to hold office" on June 30, 2004.  In addition, the Plan explained

---

[1]          Absent material revision after the relevant date, we cite a statute's current version.

it should not have included his bonuses and payments for unused vacation and sick pay in calculating his pension. The Plan stated that altogether, it had overpaid Cross by a total of $604,296. In March 2011, the Plan informed Cross that it would suspend his monthly pension payments for more than four years until it could recoup the overpayments.

¶5        Cross filed a complaint seeking judicial review of the Plan's decisions in accordance with A.R.S. §§ 12-901 through -914 (2014). The superior court reversed the decisions, ruling the Plan was precluded by contract from changing the retirement benefits it agreed to pay Cross in 2002. The court found Cross retired in June 2002 and held that his retirement benefits should be calculated based on his total salary, including bonuses and payments for unused vacation and sick leave. The court further ruled that if his benefits were to be reduced, any reduction could be prospective only. It awarded Cross past-due benefits plus interest, attorney's fees and costs.

¶6        The Plan timely appealed. We have jurisdiction pursuant to A.R.S. §§ 12–913 (2014) and -2101(A)(1) (2014).

## DISCUSSION

### A.    The Law Does Not Prevent the Plan from Correcting Cross's Pension.

¶7        Cross contends he was entitled to receive a pension during the two years after his initial retirement in 2002 and that his retirement benefits should be calculated not solely on his base salary but also on his bonuses and payments for unused vacation and sick time. We first address his alternative contention that regardless of any error in the amount of his pension, his retirement benefits vested upon his retirement in 2002 and Article 29, Section 1, of the Arizona Constitution bars the Plan from modifying those benefits thereafter.[2]

---

[2]       "On appeal from a superior court's review of an administrative decision, we must determine, as did the superior court, whether the administrative action was illegal, arbitrary, capricious or involved an abuse of discretion." *Eaton v. Arizona Health Care Cost Containment Sys.*, 206 Ariz. 430, 432, ¶ 7, 79 P.3d 1044, 1046 (App. 2003). We review questions of law *de novo*. *Id.*; *Gaveck v. Arizona State Bd. of Podiatry Examiners*, 222 Ariz. 433, 436, ¶ 12, 215 P.3d 1114, 1117 (App. 2009).

¶8        Section 1(C) of Article 29 states, "Membership in a public retirement system is a contractual relationship that is subject to article II, § 25, and public retirement system benefits shall not be diminished or impaired." This provision, which voters enacted in 1998, codifies cases holding that as a matter of common law, retirement benefits are part of the consideration for public employment and the right to a pension becomes vested upon acceptance of employment. *See Fields v. Elected Officials' Retirement Plan*, 234 Ariz. 214, 221, ¶ 31, 320 P.3d 1160, 1167 (2014). *Fields* held that pursuant to Art. 29, § 1(C), a statutory formula by which pension increases are to be calculated is a "benefit" the State could not modify to the detriment of existing members of the Plan. *Id.* ¶¶ 29, 36; *see Yeazell v. Copins*, 98 Ariz. 109, 115, 402 P.2d 541, 545 (1965) (statutes in existence when police officer was hired were part of his employment contract); *Fund Manager, Pub. Safety Pers. Ret. Sys. v. City of Phoenix Police Dep't Pub. Safety Pers. Ret. Sys. Bd.*, 151 Ariz. 487, 489, 728 P.2d 1237, 1239 (App. 1986) ("a public employee's interest in a retirement plan is so significant that it should become a right or entitlement at the outset of employment.").

¶9        Article 29 and common-law contract principles, however, only protect whatever pension rights Cross has under applicable law. That is, in *Fields* and the other cases, the court held that statutes enacted after an employee commenced work could not impair the employee's right to benefits promised by statutes in effect upon his hire or established by statutes enacted during his employment. *Fields*, 234 Ariz. at 221, ¶ 33, 320 P.3d at 1167; *Yeazell*, 98 Ariz. at 116, 402 P.2d at 546; *Fund Manager*, 151 Ariz. at 490-91, 728 P.2d at 1240-41. Nothing in Article 29 or the cases prevents the Plan from correcting an erroneously calculated pension or from recouping benefits paid to a member by mistake.

¶10        *Fields* teaches that we may look for guidance to New York cases interpreting a similar state constitutional provision protecting public employee pension benefits. *Fields*, 234 Ariz. at 220, ¶ 28, 320 P.3d at 1166.[3] In *Baker v. Regan*, 501 N.E.2d 1192 (N.Y. 1986), five state-court judges purported to retire after they were re-elected and, after commencing their new terms of office, collected retirement benefits along with their judicial salaries. *Id.* at 1192-93. After concluding the judges "had no statutory or

---

3        Article V, § 7 of the New York Constitution states, "After July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired."

contractual entitlement" to a pension while continuing to serve, the New York court of appeals held a constitutional provision protecting judges' pension benefits did not prevent the retirement system from suspending their pensions while they continued to hold office. *Id.* at 1194. Neither did the state constitution prevent the retirement system from recouping the corresponding overpayments. *Brennan v. Regan*, 548 N.Y.S.2d 848, 852 (N.Y. Sup. Ct. 1989). The same principles apply here.

¶11    Cross also argues that pursuant to A.R.S. § 38-810.02(B) (2014), his benefits vested upon his retirement in 2002 so that the Plan could not thereafter reduce the amounts set out in the paperwork he and the Plan completed when he retired. In relevant part, the statute states:

> A member of the plan does not have a vested right to benefits under the plan until the member files an application for benefits and is found eligible for those benefits. An eligible claimant's right to benefits vests on the date of the member's application for those benefits or the member's last day of employment under the plan, whichever occurs first.

From the statute, Cross argues that his pension rights vested when the Plan accepted his retirement paperwork in 2002: "If they were vested, they cannot be reduced now. Put simply, that is what 'vested' means."

¶12    We do not understand that § 38-810.02(B) prevents the Plan from correcting an error made in a form completed upon a member's retirement. When the Plan accepts a member's application for retirement, pension rights "vest" in that only then may the member begin to receive the benefits. *See Fields*, 234 Ariz. at 221, ¶ 31, 320 P.3d at 1167 (although right to receive pension "vest[s] upon acceptance of employment," the pension "is subject to conditions precedent, such as completing the term of employment"); *Krucker v. Goddard*, 99 Ariz. 227, 230, 408 P.2d 20, 22 (1965) (plan member's right to withdraw contributions vested when he "had fulfilled every condition precedent to having his contributions returned").

¶13    Nor do we agree with Cross's argument that the Plan's acceptance of his retirement application and the form by which it notified him of the amount of his monthly pension benefit together created a contract that prevents the Plan from correcting a mistake in the amount of his pension. Cross argues the paperwork he and the Plan signed in 2002 was in the form of a contract and used the language of a contract. Whatever contract existed between Cross and the Plan, however, guaranteed him only the pension due under the law, not something more.

*See Yeazell*, 98 Ariz. at 113, 402 P.2d at 544 ("the laws of the state are part of every contract"); *Lee Moor Contracting Co. v. Hardwicke*, 56 Ariz. 149, 156, 106 P.2d 332, 335 (1940). No new contract was formed by the administrative step of completing the retirement paperwork. That paperwork, moreover, must be interpreted in light of the statute discussed in the next section that allows the Plan to correct an erroneous pension calculation.

### B.     The Plan Had the Power to Adjust Cross's Pension.

¶14         By statute, the Plan has the power to "adjust future payments" when it "has made pension payments based on incorrect information." A.R.S. § 38-809(A) (2014). Cross contends this provision applies only when the Plan has mistakenly calculated a pension based on incorrect facts, but that in his case, the Plan used his correct age, credited service, salary and date of retirement to figure his pension amount. He argues the Plan's assertions that he was not entitled to receive benefits while he remained Administrator of the Plan between 2002 and 2004 and that his pension should not have been calculated based on bonus, vacation and sick leave are legal conclusions, not "incorrect information" within the meaning of the statute.

¶15         The plain language of § 38-809(A), however, does not limit the Plan's power to adjust a member's pension to a situation in which a factual error causes an incorrect calculation. *See Bilke v. State*, 206 Ariz. 462, 464, ¶ 11, 80 P.3d 269, 271 (2003) (plain language of a statute controls if it is clear and would not lead to impossible or absurd results). If the legislature had intended to limit the circumstances under which the Plan could adjust future payments to those involving incorrect factual information, it could have so stated. We will not infer such a limitation, particularly when the general rule is that public bodies may recover monies mistakenly paid, whether the mistake is one of fact or law. *See Triangle Constr., a Div. of Bentley-Dille Gradall Rentals, Inc. v. City of Phoenix*, 149 Ariz. 486, 490, 720 P.2d 87, 91 (App. 1985) (city entitled to recover funds paid to contractor by mistake); *Maricopa County v. Cities and Towns of Avondale, et al. Wickenburg*, 12 Ariz. App. 109, 112, 467 P.2d 949, 952 (1970) ("where public monies are involved, recovery is not defeated by the circumstance that the mistake is one of law rather than one of fact"). If mistakes of law caused the Plan to use an invalid retirement date or an incorrect "average annual salary" to calculate Cross's pension, § 38-809(A) allows the Plan to correct those mistakes.

### C. Recalculation of Cross's Pension.[4]

**¶16** Cross argues the Plan improperly recalculated his benefits so as to reduce his monthly pension.[5]

### 1. Date Cross became eligible to receive retirement benefits.

**¶17** Pursuant to A.R.S. § 38-805(A) (2014), a member of the Plan who "ceases to hold office" is eligible to receive retirement benefits if he or she satisfies certain age and service conditions. The Plan contends Cross did not "cease to hold office" after his purported retirement on June 30, 2002, because he returned to work the following day, performing the same duties for the same salary. It argues Cross did not actually retire under Arizona law until June 2004.

**¶18** The Plan's determination that Cross continued to work without interruption as Administrator after his purported retirement in 2002 is supported by the record. *See* A.R.S. § 12-910(E) (2014) (court shall affirm the agency action unless it is not supported by substantial evidence, or is contrary to law, arbitrary and capricious, or an abuse of discretion); *St. Joseph's Hosp. v. Arizona Health Care Cost Containment Sys.*, 185 Ariz. 309, 312, 916 P.2d 499, 502 (App. 1996) ("In appeals taken under the Administrative Review Act, neither this court nor the superior court weighs the evidence."). According to the minutes of the meeting of the

---

[4] Cross contends that if his pension is recalculated, it must be based upon his final annual salary, not his last three years of salary. The superior court judgment directed the Plan to calculate Cross's pension in accordance with the methodology used in 2002, and Cross did not appeal that determination. We therefore do not consider this contention. *A M Leasing Ltd. v. Baker*, 163 Ariz. 194, 195-96, 786 P.2d 1045, 1046-47 (App. 1989) (appellee who did not cross-appeal from judgment could not seek to enlarge his rights under the judgment).

[5] Cross did not request an administrative hearing and the parties submitted this matter to the superior court on stipulated facts. Accordingly, we consider whether the Plan properly applied the law to undisputed facts. Although we give the Plan's interpretation of relevant statutes some weight, we need not defer to its legal conclusions. *Thomas and King, Inc. v. City of Phoenix*, 208 Ariz. 203, 206, ¶ 8, 92 P.3d 429, 432 (App. 2004).

Plan's Board of Directors of June 19, 2002, Cross had met with all but one of the Board members before the meeting "about his intent to retire on June 30" and had "expressed [to them] his desire to be appointed as Administrator during the transition period [to a successor Administrator] with no change in his current rate of pay." The Board unanimously approved a motion to appoint Cross as Administrator "during the transition period for a minimum of 6 months, and extending that period as needed, at his same salary until" the Board decided what to do about his replacement.

¶19 In support of its position that Cross did not "cease to hold office" for purposes of § 38-805(A), the Plan cites interpretations of a similar term, "separation from service," as it concerns retirement and pension funds established under the Internal Revenue Code ("IRC"), 26 U.S.C. § 401(a)(15) (2014). The Internal Revenue Service ("IRS") has taken the position, endorsed by some courts, that a separation from service requires a "complete and good faith termination of the employment relationship." *Barrus v. U.S.*, 23 A.F.T.R.2d 69-990 (E.D.N.C. 1969) ("The separation and termination occur when the employer no longer pays the employee in any way for services rendered, when decisions which affect the business operation are no longer made by, directed or carried out by the employee, and when the employee is no longer under the direction and control of the employer."); *see also Edwards v. C.I.R.*, 57 T.C.M. (CCH) 1217 (T.C. 1989) *aff'd,* 906 F.2d 114 (4th Cir. 1990) (separation from service requires a formal, rather than technical, change in the employment relationship); *Baillie v. Pub. Sch. Employees' Ret. Bd.*, 993 A.2d 944, 951-52 (Pa. Commw. Ct. 2010) (affirming school board's determination that employee did not separate from service when he "retired" on Friday and returned to work in the same capacity on Monday as a temporary employee under an emergency contract); I.R.S. P.L.R. 201147038 (Nov. 25, 2011) (employees who do not actually separate from service and cease performing services for the employer are not legitimately retired under section 401(a); "if both the employer and employee know at the time of 'retirement' that the employee will, with reasonabl[e] certainty, continue to perform services for the employer, a termination of employment has not occurred upon 'retirement' and the employee has not legitimately retired").

¶20 Cross cites no Arizona authority bearing on the meaning of the phrase "ceases to hold office," but contends the IRS rulings are irrelevant because the Plan must pay benefits to its members under state law regardless of IRS qualification requirements. The Plan argues to the contrary, citing A.R.S. § 38-810.01 (2014) (Plan is intended to be a qualified

pension plan under IRC, 26 U.S.C. § 401). Even if the IRS rulings are not controlling, they are helpful to our analysis of what it means to "cease to hold office" within the meaning of the Arizona statute.

¶21　　　　Pursuant to § 38-808(B) (2014), after 20 years of credited service, Cross was entitled to retire in 2002 and receive a pension of 80 percent of his average yearly salary. Cross argues no reasonable public employee in his position would continue in his or her job without having first retired – to do so, he asserts, effectively would mean continuing to work for just 20 percent of a salary. We cannot quarrel with Cross's description of the financial realities he faced, but § 38-805(A) (2014) allowed him to collect a pension from the Plan only if he "cease[d] to hold office."[6]

¶22　　　　Cross maintains he was allowed to retire from the Plan and return to work by 2001 Ariz. Sess. Laws, ch. 62 § 2 (1st Reg. Sess.) (S.B. 1232), adopted in 2001 and then codified at A.R.S. § 38-804(G) (2001).[7] That statute previously provided that a "retired member" of the Plan who "becomes an elected official of the same office from which the member retired" could not receive retirement benefits while he or she continued in the office. A.R.S. § 38-804(E) (1999). With S.B. 1232, the legislature changed the statute retroactively to provide that when "a retired member subsequently becomes, *by reason of election or reelection*, an elected official of the same office from which the member retired" within a time period following the member's retirement that is less than one full term for that office, that member may not receive retirement benefits while serving in office. A.R.S. § 38-804(G) (2001) (emphasis added).

---

[6]　　As Cross points out, Arizona law does not generally prohibit pensioners from supplementing their income with public employment. For example, by statute, members of the Arizona State Retirement System expressly are allowed to retire and then return to full-time public employment, but unless they wait 12 months to return, they must take a job that "[r]esults in a true change in position, job duties and job title." *See* A.R.S. §§ 38-766(D) (2014) and -766.01 (2014). Those statutes do not apply to the Elected Officials Retirement Plan, however.

[7]　　The statute was subsequently reorganized and this provision, slightly modified, is now found at A.R.S. § 38-804(L) (2014).

¶23       Cross does not argue the change was intended to apply to his particular situation; to the contrary, it appears that the amendment was intended to accommodate a retired member of the Yavapai County board of supervisors who was appointed to complete the remainder of his successor's term upon the successor's own retirement.   He argues, however, that the legislature added the italicized words to allow a retired member of the Plan to be temporarily appointed to the office previously held while continuing to receive retirement benefits.  Because the plain language of the statute restricts its application to a "retired member," we agree with the Plan that this provision applies only to a member *who has ceased to hold office* and who returns to work in an appointed position.  It does not allow a Plan member to simultaneously collect both pension and salary by quitting his position one day and returning to work in the same position the next.  If, as the Plan properly concluded, Cross had not "ceased to hold office," the statute does not apply to him.

¶24       In sum, Cross did not "cease[] to hold office" when he purported to retire as Administrator of the Plan on June 30, 2002.  The next business day following his "retirement," he was at his desk at the Plan, with the same title and job duties as before.[8]  On these facts, it is plain that Cross was not eligible under A.R.S. § 38-805(A) to receive a pension at that time.

## 2.    Average annual salary.

¶25       The pension of a retiree who joined the Plan before July 1, 2012 is calculated by multiplying four percent of the member's "average yearly salary" by the number of his years of credited service.  A.R.S. § 38-808(B)(1).  Because he retired after 20 years in the Plan, Cross's pension therefore is 80 percent of his "average annual salary."  A.R.S. 38-805(A)(3), -808(B)(1).  Cross argues the Plan improperly recalculated his pension by excluding bonuses and payments for unpaid vacation and sick leave from his "average annual salary."

---

[8]       Cross argues that after June 30, 2002, his job duties as Administrator expanded because he was to help the Board find his replacement.  Cross does not identify any particular task he performed in that regard, however, and according to meeting minutes, shortly after June 30 he recommended the Board appoint his next-in-command to replace him.

¶26        In interpreting a statute, we first look to the language of the statute itself. *In re Estate of Jung*, 210 Ariz. 202, 204, ¶ 12, 109 P.3d 97, 99 (App. 2005). "If the language is clear, the court must 'apply it without resorting to other methods of statutory interpretation' unless application of the plain meaning would lead to impossible or absurd results." *Bilke*, 206 Ariz. at 464, ¶ 11, 80 P.3d at 271 (quoting *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994)). If the language is not clear, we consider other factors such as "the context of the statute, the language used, the subject matter, its historical background, its effects and consequences, and its spirit and purpose." *In re Estate of Jung*, 210 Ariz. at 204, ¶ 12, 109 P.3d at 99. To ascertain the meaning of a term not defined in the statute, we assume that unless the legislature said otherwise, a word is to be given its natural and obvious meaning, which may be discerned from its dictionary definition. *State v. Jones*, 188 Ariz. 388, 392, 937 P.2d 310, 314 (1997).

¶27        Before 2000, Arizona law defined "average yearly salary" as:

> [T]he result obtained by dividing the total base salary paid to an employee during a considered period by the number of years, including fractional years, in which the base salary was received. The considered period shall be the three consecutive years within the last ten completed years of credited service which yield the highest average.

A.R.S. § 38-801(2) (1994).

¶28        In 2000, the legislature amended that provision to remove the word "base" from the term "total base salary." 2000 Ariz. Sess. Laws, ch. 126, § 1 (2nd Reg. Sess.) (S.B. 1127). Cross argues that the change broadened the meaning of the term "salary" in the statute. In support, he cites a legislative Fact Sheet that stated the amendment "[e]xpands the definition of average yearly salary in EORP [Elected Officials Retirement Plan] by deleting the word *base*." Senate Fact Sheet, S.B. 1127, 44th Leg., 1st Reg. Sess. (Ariz. May 1, 2000) (emphasis in original). The record does not disclose the author of the Fact Sheet, but we do not understand the comment to compel the conclusion that the legislature intended to include bonuses and payouts for unused vacation and sick time within the "average annual salary" used to calculate pensions of members in the Plan. Elected officials in the Plan are not entitled to receive bonuses, vacation or sick time; the only non-elected member of the Plan to whom such a change might have been relevant was Cross. As administrator of the Plan, Cross himself testified about the bill at the committee hearing. According

to the minutes, he was permitted to give his opinion of the bill even though he was a member of the Plan because, as he explained it, the measure was "an administrative bill" and "not a benefit increase." That contemporaneous disclaimer is a telling concession that flies in the face of Cross's current contention that the 2000 amendment was intended to enlarge his benefits.[9]

¶29　　　The Plan contends other legislative history shows that the legislature did not intend the 2000 amendment to change benefit calculations. It cites the testimony of an intern for the majority before the House of Representatives Committee on Government Operations on February 23, 2000, who explained that "compensation" elsewhere in the retirement statutes was being changed to "salary" to conform to the use of the term "salary" throughout the statutes concerning the Elected Officials Retirement Plan.

¶30　　　As the statutory scheme does not define the word "salary," we consider its ordinary meaning:

> An agreed compensation for services — esp[ecially] professional or semiprofessional services — usu[ally] paid at regular intervals on a yearly basis, as distinguished from an hourly basis.

*Black's Law Dictionary* 1454 (9th ed. 2009).

¶31　　　Consistent with the dictionary definition, legal authorities have concluded that "salary" does not include bonuses or other amounts not paid at regular intervals. *See* Dale Joseph Gilsinger, Annotation, *What Constitutes "Salary," "Wages," "Pay," or the Like, Within Pension Law Basing*

---

[9]　　　The legislature has mandated that sick leave payments may not be included when calculating the pensions of other public employees. *See* A.R.S. § 38-615(F) (2014) (applicable to certain public employees, and stating payments for accumulated sick leave "shall not be used to compute the average salary" and are "not salary or compensation for the purposes of making retirement contributions or computing any pension benefit"); *see also* A.R.S. § 38-711(7) (2014) (excluding payments for vacation and sick leave from the definition of "compensation" in the Arizona State Retirement System).

*Benefits Thereon*, 91 A.L.R.5th 225, § 5[b] (originally published in 2001).[10] Almost all courts that have addressed the issue have held that payments for accrued sick leave may not be included in a pension calculation. *See* 91 A.L.R.5th 225, § 6[b]; *see, e.g., Int'l Ass'n of Firefighters, Local No. 64 v. City of Kansas City*, 954 P.2d 1079, 1088 (Kan. 1998) ("salary" in pension statute does not include sick leave or vacation time); *West Va. Cons. Pub. Retirement Appeals Bd. v. Carter*, 633 S.E.2d 521, 526 (W. Va. 2006) ("final average salary" in pension statute does not include payment for unused vacation time). As we have noted *supra* ¶ 28, note 10, accrued sick leave payments may not be included when calculating the pensions of other public employees. *See* A.R.S. § 38-615(F) (2014).

**¶32** Cross argues that because § 38-801(5) defines "average yearly salary" by reference to the term "total salary," the phrase must mean more than "salary." But "total" is used in § 38-801(5) only to describe how an "average salary" is derived (i.e., "the result obtained by dividing the total salary paid to an employee . . . by the number of years . . . in which the salary was received"). We do not understand the legislature's use of the word "total" in the statute to bear on the issue of whether "average salary" includes bonuses or payments for unused vacation and sick leave.

**¶33** Cross also points out that his contributions to the Plan were based on his salary plus bonuses and payments for vacation time and sick leave buyouts. Several courts have afforded substantial importance to this factor. *See, e.g., Palyok v. Borough of W. Mifflin*, 586 A.2d 366, 368 (Pa. 1991) (interpreting "salary" in pension statute to include overtime pay, in part because retirement plan contributions were deducted from the overtime pay); *Hill v. City of Lincoln*, 330 N.W.2d 471, 474 (Neb. 1983) (overtime and holiday pay not included for purposes of calculating pension benefits, in part because retirement plan did not require member contributions for those amounts); *see also* 91 A.L.R.5th 225, § 40[a] & [b]. Other courts, however, have refused to require an agency to include additional payments when computing pension benefits even though pension contributions were withheld from those payments. *See Grabicki v. Dep't of Ret. Sys.*, 916 P.2d 452, 458 (Wash. App. 1996).

**¶34** The Plan implicitly concedes it erred by collecting contributions from Cross calculated on his bonuses and unused vacation

---

[10] In contrast, the term "compensation" is defined to include "remuneration for services rendered," whether in salary, fees or commissions. *Black's Law Dictionary* 322 (9th ed. 2009).

and sick leave; at oral argument before this court, its counsel said the Plan had set off those excess contributions in calculating the amount of overpayment allegedly due from Cross. In any event, we reject any contention that the Plan's collection of contributions from Cross's bonuses and sick leave and vacation payments represent a considered interpretation of the statute to which we should defer. During the majority of the years in which the Plan collected these contributions, "average annual salary" was defined with reference to "total base salary," and Cross does not argue that any reasonable meaning of "base salary" includes bonuses or payments for unused vacation or sick leave. *See* A.R.S. § 38-801(5) (1994).

¶35        In sum, we conclude "average annual salary" as defined in § 38-801(5) does not include bonuses or payments made to a member in lieu of sick time or vacation. The only member of the Plan eligible to receive such payments was Cross, and nothing in the legislative history reveals that the legislature intended to enlarge his pension rights when it amended the statute in 2000. For that reason, the Plan properly excluded Cross's bonus amounts and payments for vacation and sick leave when it recalculated his retirement benefits.

### D.    The Plan's Recoupment Decision.

¶36        After determining it had paid Cross too much in pension benefits from 2002 to 2010, the Plan announced it would suspend Cross's future pension payments until it had recouped all of the overpayments.[11] The Plan asserts A.R.S. § 38-803(B)(4) (2014) authorizes that decision. The statute allows the Plan to "[d]o all acts, whether expressly authorized, which may be deemed necessary or proper for the protection of the fund." The Plan argues that under the statute, it was allowed to recover the overpayments in the interest of protecting the solvency of the Plan. *See Sorensen v. Saint Alphonsus Regional Med. Ctr., Inc.*, 118 P.3d 86, 92-93 (Idaho 2005) (retirement plan had fiduciary duty to all participants to collect overpayments to ensure plan's tax status); *City of New York v. Ret. Bd. of Teachers' Ret. Sys. of the City of New York*, 455 N.Y.S.2d 703, 705 (N.Y. Sup. Ct. 1982) (retirement board's fiduciary duty to protect retirement plan required it to withhold future pension payments to recover overpayments).

---

[11]        The Plan's notice to Cross said it would withhold his pension "until the overpayment and interest are fully recovered." According to Cross, that amounts to about four years of monthly pension payments.

¶37            We agree § 38-803(B)(4) grants the Plan the power to recover pension overpayments mistakenly made.  Section 38-809(A) (2014), which the Plan also cites, likewise grants the Plan the power to recoup overpayments made, as here, based on incorrect information:

> If the plan has made pension payments based on incorrect information and a person or an estate has been paid more or less than the person or estate should have been paid, the board shall adjust future payments so that the proper amount is paid.  The adjustment may be made in such a manner that the equivalent actuarial present value of the benefit to which the person or estate is correctly entitled is paid.

¶38            In response to our request for supplemental briefing on the recoupment issue, Cross argues that under the second sentence of subpart A, recited above, even if the Plan is entitled to recoup the overpayments, it should do so by way of an actuarial adjustment of future payments, not by suspending payments altogether for a period of time.  In an affidavit filed in the superior court, Cross asserted that during the many years he worked for the Plan, he knew of "no instance of an overpayment to a participant being recouped by terminating the participant's benefit altogether."  Instead, he stated, "the Plan always required repayment over the same length of time the overpayment occurred or longer if this would cause a hardship."  As the Plan argues, however, although subpart A of the statute allows the Plan to recoup overpayments by an actuarial adjustment, it does not require the Plan to do so.

¶39            Nevertheless, Cross argues we should affirm the superior court's conclusion that the doctrine of equitable estoppel bars the Plan's recoupment decision.  *See Valencia Energy Co. v. Ariz. Dept. of Rev.*, 191 Ariz. 565, 576, ¶ 31, 959 P.2d 1256, 1267 (1998) (estoppel may lie against the government).

¶40            "The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct."  *Id.*  "[I]f the traditional elements of estoppel are present, it will apply against the government 'when the public interest will not be unduly damaged and when its application will not substantially and adversely affect the exercise of governmental powers.'"  *City of Tucson v. Clear Channel Outdoor,*

*Inc.*, 218 Ariz. 172, 191, ¶ 67, 181 P.3d 219, 238 (App. 2008) (quoting *Valencia*, 191 Ariz. at 578, ¶ 40, 959 P.2d at 1269).

**¶41**　　　　There can be no dispute that the first two elements of equitable estoppel are satisfied -- the Plan calculated and paid Cross's retirement benefits for eight years in an amount it later alleged was contrary to law, and there is no evidence that Cross did not rely on the Plan's calculations in accepting his pension.

**¶42**　　　　The Plan argues Cross cannot satisfy the third element, the requirement that he prove injury of the sort permitting estoppel.　It contends the only injury Cross can allege is that after recoupment, he will have received in pension benefits only the amount to which he is entitled under the law.　*See Valencia*, 191 Ariz. at 577, ¶ 38, 959 P.2d at 1268 ("no detriment is incurred when the party's only injury is that it must pay taxes legitimately owed under the correct interpretation of the law").　Cross responds that requiring him to refund the overpayments is "an unacceptably harsh interpretation and application of the law" that would have a "devastating effect" on him and his family.　He contends that by contrast to a taxpayer whose only prejudice is the inconvenience of having to pay "taxes legitimately owed," *id.*, if the Plan had decided in 2002 that he could not both retire and continue on as administrator, he would have retired, quit work at the Plan and obtained a more lucrative position elsewhere while enjoying his pension.　In the superior court, Cross argued that in reliance on his pension, he forwent "continuing my career as a full-time pension plan manager or other full-time occupation in the financial services industry."[12]

**¶43**　　　　We review a decision to apply estoppel for an abuse of discretion.　*Clear Channel Outdoor, Inc.*, 218 Ariz. at 190, ¶ 65, 181 P.3d at 237.　"Questions of estoppel . . . are fact-intensive inquiries.　We defer to the trial court with respect to any factual findings explicitly or implicitly made, affirming them so long as they are not clearly erroneous." *John C.*

---

[12]　　Although the Plan suggests that Cross, as the Plan's Administrator, conceived a scheme to manipulate the Plan and obtain inflated retirement benefits, there is no evidence in the record that Cross engaged in intentional deception or manipulation to procure unlawful benefits.

*Lincoln Hosp. and Health Corp. v. Maricopa County*, 208 Ariz. 532, 537, ¶ 10, 96 P.3d 530, 535 (App. 2004) (citations omitted).[13]

**¶44**        The superior court made no findings in support of its conclusion that the Plan was estopped from recouping its overpayments to Cross. Although normally we will infer factual findings necessary to support the judgment of the superior court, *see id.*; *Mong Ming Club v. Tang*, 77 Ariz. 63, 67, 266 P.2d 1091, 1094 (1954), that rule does not apply when, as here, a party asked the superior court to make findings of fact, *Elliott v. Elliott*, 165 Ariz. 128, 135, 796 P.2d 930, 937 (App. 1990). When a party has requested findings but the court has not made them, we will not assume the court found every controverted issue of fact necessary to sustain the judgment. *Elliot*, 165 Ariz. at 135, 796 P.2d at 937; *see Silva v. De Mund*, 81 Ariz. 47, 50, 299 P.2d 638, 640 (1956).

**¶45**        Here, although the Plan requested findings of fact, the superior court did not make findings, instead ruling in summary fashion that "Cross's authorities and arguments are persuasive and controlling and [the court] agrees with them, and adopts them in support of its conclusion that the Plan is precluded from collecting overpayment of benefits it has already made to Cross." In the absence of findings of fact in this situation, we are unable to review the superior court's exercise of its discretion to apply estoppel against the Plan. We therefore vacate the judgment insofar as it overturned the Plan's decision to recoup the pension overpayments the Plan made to Cross between 2002 and 2010,

---

[13]        In his complaint seeking judicial review of the Plan's decisions, Cross alleged the Plan was "barred by the doctrines of laches and estoppel" from recouping alleged overpayments by suspending his monthly pension until it had recovered the full amount allegedly due. On appeal, Cross cites evidence before the superior court but not in the administrative record as support for these defenses. The Plan does not argue the superior court was precluded by principles of administrative review from considering such evidence in determining whether estoppel applied. *See, e.g.*, *Havasu Heights Ranch and Dev. Corp. v. Desert Valley Wood Products, Inc.*, 167 Ariz. 383, 386-87, 807 P.2d 1119, 1122-23 (App. 1990) (on review of administrative decision, court's determination is based on record in administrative proceeding and parties' legal arguments). As presented by the parties on appeal, therefore, the issue is whether, based on the record before the superior court, that court abused its discretion in concluding estoppel bars the Plan from recouping the overpayment by suspending Cross's pension.

and remand that issue for further proceedings in the superior court. *See Miller v. McAlister*, 151 Ariz. 435, 437, 728 P.2d 654, 656 (App. 1986) (remanding for fact-finding by the superior court).

**CONCLUSION**

**¶46**　　　For the foregoing reasons, we reverse the superior court's judgment insofar as it overturned the Plan's determination that Cross was not entitled to collect retirement benefits before his final separation from employment in 2004 and that Cross's pension should have been calculated without considering bonuses and payments for unused sick leave and vacation. We vacate and remand to the superior court that portion of its judgment holding the Plan is barred by estoppel from suspending Cross's pension payments to recoup the overpayments. We also vacate the superior court's grant of attorney's fees and costs to Cross. As the prevailing party on appeal, the Plan is entitled to its costs on appeal, contingent on compliance with Arizona Rule of Civil Appellate Procedure 21.



Ruth A. Willingham · Clerk of the Court
F I L E D : gsh