BROWN, Judge:
¶1 This opinion addresses the enforceability and constitutionality of an administrative regulation that partially ended a longstanding practice of including payouts for accrued sick leave when calculating an employee's pension benefits under the City of Phoenix Employees' Retirement Plan ("Plan"). Because Phoenix voters never took any affirmative act to authorize this practice, we hold the regulation does not violate common-law or constitutional protections applicable to public employee pensions.
BACKGROUND
¶2 Phoenix is a home rule city organized under Article 13, Section 2 of the Arizona Constitution through adoption of a city charter ("Charter") in 1913. Phoenix voters amended the Charter in 1953 to adopt the Plan and vested administrative, management, and operation authority for the Plan in a Retirement Board. Phoenix City Charter, ch. XXIV, art. II, §§ 3.1, 4.1. Except where noted, we refer to Phoenix, the Retirement Board, and the Plan collectively as "the City."
¶3 AFSCME Local 2384, AFSCME Local 2960, and ASPTEA ("Unions") represent three "units" of Phoenix employees and are joined in this litigation by 12 retired employees who began receiving pension benefits under the Plan after July 8, 2012 ("Retirees"), as well as four current Phoenix employees ("Current Employees"). Unless otherwise noted, we refer to the Unions, Retirees, and Current Employees collectively as "Members."
¶4 Under the Plan, an employee's pension benefit is calculated by multiplying three figures:
*833 (1) "final average compensation," (2) credited service, and (3) a defined benefit rate. "Final average compensation" is calculated based on a member's average compensation paid over a three-year period of credited service. Phoenix City Charter, ch. XXIV, art. II, §§ 2.13, 2.14. As explained below, a member's "compensation" may either be monetary ("salary or wages") or non-monetary. See id. at § 2.13. Phoenix voters amended the Plan in 1973 to allow members to include additional credited service based on the amount of accrued sick leave they had remaining at retirement but never authorized the use of accrued sick leave as part of the pension calculation. Id. at § 14.4.
¶5 Consistent with collective bargaining agreements between Phoenix and the Unions, the city manager adopted Administrative Regulation ("A.R.") 2.441 in 1996, which allowed employees to convert a certain percentage of their accrued unused sick leave hours to a cash payout at retirement. A.R. 2.441 was silent as to whether the Charter required this payout to be treated as "compensation" for purposes of calculating pensions. As a matter of administrative practice, however, from 1996 to 2012 the Retirement Board counted these one-time payouts as part of the employee's "final average compensation," and the City repeatedly communicated this practice to employees.
¶6 The City created a pension reform task force to evaluate the health of the Plan. The task force recommended, among other things, that the City prospectively end the practice of including accrued sick leave payouts at retirement in the pension calculation. During negotiations with the Unions regarding the 2012-2014 collective bargaining agreements, Phoenix proposed a "sick leave snapshot" program that would have prospectively ended the practice but would still allow Plan members to include payouts for unused sick leave hours accrued as of July 1, 2012 in their "final average compensation." The Unions rejected the proposal and thus the 2012-2014 collective bargaining agreements did not explicitly address whether Plan members could include accrued sick leave payouts in their "final average compensation." The deputy city manager then amended A.R. 2.441 ("Revised A.R. 2.441"), essentially adopting the snapshot program by excluding payouts for sick leave accrued after July 1, 2012, from an employee's pensionable compensation.
¶7 Several days before this amendment, Current Employees and the Unions sued the City, seeking declaratory, injunctive, and mandamus relief based on the claim that Revised A.R. 2.441 would unlawfully reduce their pension benefits. After Retirees intervened the superior court conducted a bench trial on various issues, including whether Members had "a vested and contractual right" to include accrued sick leave payouts in the calculation of their "final average compensation."
¶8 The superior court ruled in favor of the Members, finding that (1) unused sick leave is non-monetary "compensation" under the Plan; (2) the city council fixed the value of that compensation through A.R. 2.441 and its repeated approval of the collective bargaining agreements; and (3) the parties to those agreements understood that accrued sick leave payouts were included as "final average compensation." The court explained that a public employee has a right to "the existing formula by which his benefits are calculated as of the time he began employment," Fields v. Elected Officials' Ret. Plan , 234 Ariz. 214, 220, ¶ 27, 320 P.3d 1160, 1166 (2014), and ultimately concluded that Phoenix could not unilaterally change the sick leave regulation.
¶9 After the parties submitted briefing on the scope of damages and potential equitable relief, the superior court enjoined the City from using Revised A.R. 2.441 to calculate Retirees' pension benefits, awarded Retirees a combined total of $5,482.04 in damages, and awarded Members $22,328.37 in taxable costs. The court declined to award attorneys' fees to either party. This timely appeal and cross-appeal followed.
DISCUSSION
¶10 The City argues that accrued sick leave payouts do not qualify as "compensation" under the Plan and thus Members have no common-law or constitutional right to compel the City to include such payouts in their "final average compensation." Members *834 counter that accrued sick leave constitutes non-monetary "compensation," as defined by the Plan. Alternatively, Members argue the payout is monetary "compensation" because it is part of a member's "salary or wages."
¶11 Because Yeazell v. Copins , 98 Ariz. 109, 402 P.2d 541 (1965), and its progeny hold that "public employees are contractually entitled to the retirement benefits specified in their initial employment contract," Hall v. Elected Officials' Ret. Plan , 241 Ariz. 33, 40, ¶ 20, 383 P.3d 1107, 1114 (2016), we begin by analyzing the terms of that contract, which is the Plan.
A. Common Meaning of Compensation Under the Charter
¶12 We apply principles of constitutional construction to home rule city charters. City of Phoenix v. Yates , 69 Ariz. 68, 73, 208 P.2d 1147 (1949).[1] Our primary goal is to effect the intent of the electorate that adopted the Plan. See Glazer v. State , 244 Ariz. 612, 614, ¶ 9, 423 P.3d 993, 995 (2018). The best indicator of that intent is the Plan's plain language. See id. To achieve our goal, we may look to dictionaries to ascertain and apply a word's plain meaning unless the context suggests the electorate intended a different meaning. State v. Burbey , 243 Ariz. 145, 147, ¶ 6, 403 P.3d 145, 147 (2017). Reliance on secondary interpretive tools is appropriate only if the pertinent language remains open to conflicting reasonable interpretations "after examining the statute's text as a whole or considering statutes relating to the same subject or general purpose." Glazer , 244 Ariz. at 614, ¶ 12, 423 P.3d at 995 ; Burbey , 243 Ariz. at 145, ¶ 7, 403 P.3d at 145.
¶13 Full-time Phoenix employees, unless otherwise excluded (such as those covered by other retirement plans), are eligible for membership in the Plan. Phoenix City Charter, ch. XXIV, art. II, §§ 2.5-2.6, 12.1-12.2, 31.1. As pertinent here, the Plan defines "final average compensation" as the "average of the highest annual compensations paid a member for a period of 3 consecutive ... years of his credited service." Id. at § 2.14. "Compensation" is defined to include monetary compensation and non-monetary compensation. Monetary compensation is defined as "a member's salary or wages paid him by the City for personal services rendered by him to the City." Id. at § 2.13 (emphasis added). Non-monetary compensation is compensation " not all paid in money," the value of which is fixed by the City Council. Id.
¶14 We first disagree with the superior court's finding that one-time cash payouts at retirement represent non-monetary compensation under § 2.13. Id. The accrued sick leave benefits are paid in money, and the City Council need not determine their value, thus disqualifying the payouts as non-monetary compensation under the Charter.
¶15 We next consider whether such payouts are "compensation," meaning "salary or wages," under the Charter. The City argues those terms cover only fixed amounts of money paid on a regular basis, while the Members contend "compensation" includes any remuneration or money paid for an employee's services. In isolation, the terms "salary or wages" might reasonably be open to the conflicting definitions the parties assign to them. However, after considering their ordinary meaning and the Plan as a whole, we find only one reasonable interpretation. See Glazer , 244 Ariz. at 614, ¶ 12, 423 P.3d at 995 ; Wade v. Ariz. State Ret. Sys. , 241 Ariz. 559, 562, ¶ 13, 390 P.3d 799, 802 (2017).
¶16 We begin by examining the meaning of "salary." See Wade , 241 Ariz. at 562, ¶ 14, 390 P.3d at 802. The broad definition championed by Members clashes with the ordinary meaning of this word as determined by the Arizona Supreme Court and this court, both of which defined salary as a fixed sum paid on a regular basis. Id. (citing Salary , Black's Law Dictionary (10th ed. 2009));
*835 Cross v. Elected Officials Ret. Plan , 234 Ariz. 595, 604, ¶¶ 30-31, 325 P.3d 1001, 1010 (App. 2014) (citing Salary , Black's Law Dictionary (9th ed. 2009)). The context in which § 2.13 uses the term "salary" does not indicate the electorate intended to depart from this ordinary meaning. Therefore, we reject Members' contention that "salary" should be broadly defined as any remuneration or money paid to an employee for services.
¶17 Members argue that "deliberate use of the terms 'salary or wages' evinces a clear intent to capture all moneys paid directly to employees for services rendered, regardless of labels." Because the Charter separates "wages" from "salary" by the disjunctive "or," it might be that "wages" covers different payments. See State v. Pinto , 179 Ariz. 593, 595, 880 P.2d 1139, 1141 (App. 1994) ("The word 'or,' as it is often used, is '[a] disjunctive particle used to express an alternative or to give a choice of one among two or more things.' " (citation omitted)). But the element of regularity for "salary" identified by Wade and Cross is also a cardinal feature of "wages," particularly when those words are used together to define the scope of "compensation" for calculating public employee retirement benefits. See Wade , 241 Ariz. at 562, ¶ 15, 390 P.3d at 802 (addressing deferred compensation payments made "in regular, equal installments, in exchange for employment services" paid in addition to an employee's "base salary"); see also Wages , American Heritage Dictionary (5th ed. 2011) (defining "wages" as "[a] regular payment, usually on an hourly, daily, or weekly basis, made by an employer to an employee, especially for manual or unskilled work"); accord New Oxford American Dictionary (3d ed. 2010); Oxford English Dictionary (2d ed. 1989); Webster's New Collegiate Dictionary (1976); Webster's New International Dictionary (2d ed. 1946). Nothing in § 2.13 suggests the Phoenix electorate, in defining what payments qualify for pension benefits under the Plan, intended that wages would include more than regularly-made payments.
¶18 We are not persuaded that "salary" and "wages" cannot share overlapping meanings. See Wade , 241 Ariz. at 562, ¶ 18, 390 P.3d at 802 ; see also Lamie v. U.S. Trustee , 540 U.S. 526, 536, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("Surplusage does not always produce ambiguity and our preference for avoiding surplusage constructions is not absolute."). The Plan does not use "salary" and "wages" as mutually exclusive alternatives. Instead, the Plan always uses the words in tandem, and together they comprise the possible universe of monetary "compensation." The Plan's text provides no indication that Phoenix voters intended to treat salary and wages differently from each other when calculating pensions.
¶19 On the contrary, if "compensation" includes irregular payments, it would render other provisions of the Plan unworkable. See Glazer , 244 Ariz. at 615, ¶ 17, 423 P.3d at 996. For instance, the "employees' savings fund" requires that a member contribute 5.0% of his or her "annual compensation," which is done by "deduct[ing] from the compensation of each member on each and every payroll, for each and every payroll period so long as he [or she] remains a member of the ... Plan." Phoenix City Charter, ch. XXIV, art. II, § 27.1(a)-(b). This provision assumes "compensation" is based "on each and every payroll." Because Arizona law requires payroll to occur at least twice a month, see Ariz. Rev. Stat. ("A.R.S.") § 23-351(A), "compensation" as used in this provision can only refer to payments made on a regular basis.
¶20 Furthermore, the Plan limits membership to "employees," Phoenix City Charter, ch. XXIV, art. II, §§ 12.1-12.2, defined as persons "in the employ of the City on a full time basis," id. at § 2.5. This restriction on the definition of "employee" means that a Plan member must work on a regular basis. Id. (" '[F]ull time basis' means employment on a work schedule which consists of the number of full time hours per week designated for the class of employment for the employee's classification, and which work schedule is intended to be continuous over a period of 12 months at the aforementioned full time hours per week."). And because the Plan excludes from its membership "any person who furnishes personal services to the City on a contractual or fee basis," id. , it necessarily assumes a member will be paid on a regular basis.
*836 ¶21 Applying the ordinary meaning of "salary or wages," we hold that a one-time payout at retirement for accrued sick leave does not fall within the "final average compensation" multiplier of the Plan's pension formula. See Cross , 234 Ariz. at 604, ¶ 31, 325 P.3d at 1010 ("Almost all courts that have addressed the issue have held that payments for accrued sick leave may not be included in a pension calculation."). An employee is eligible to receive this payout only once, and only during his or her retirement year. Accordingly, the payout is not paid to employees on a regular basis and is therefore not "compensation" under the Plan.[2]
¶22 Having concluded the Charter does not require accrued sick leave payouts to be included as "final average compensation" when the pension benefit is calculated, we now consider the legality of the City's decision to halt that practice.
B. Legality of Revised A.R. 2.441
¶23 Members assert the City violated the common-law and constitutional protections applicable to retirement benefits when it revised A.R. 2.441 because the City cannot eliminate their contractual and constitutional rights to the "pension benefit formulas as they were promised, administered and existed from commencement of employment or from beneficial modification of those benefits." To reiterate, Revised A.R. 2.441(5)(A) limits "[t]he amount of sick leave eligible for inclusion in the calculation of an employee's Final Average [Compensation] at the time of retirement ... to the number of hours in an employee's sick leave bank on July 1, 2012." Thus, the City ceased including sick leave payouts in the pension calculation for all employees hired after that date. For existing employees, if they otherwise meet eligibility requirements, the "snapshot program" reflected in the regulation allows them to use accrued sick leave payouts to increase their pension benefits, but only for hours that accrued no later than July 1, 2012.
¶24 Members rely on Yeazell , the Arizona Pension Clause, and the Contract Clauses of the Arizona and United States Constitutions to support their position. We review the constitutionality of a regulation de novo. See Hall , 241 Ariz. at 38, ¶ 14, 383 P.3d at 1112. We presume the ordinance or regulation is constitutional, and require those asserting a constitutional challenge to "bear[ ] the burden of overcoming the presumption." Id.
¶25 In Yeazell , our supreme court held that disputes over public employee pension rights should be settled according to the common law of contracts. 98 Ariz. at 114, 402 P.2d 541. Applying this principle, Yeazell held that the government may not retroactively diminish a public employee's pension benefits because doing so would be an impermissible unilateral modification of that employee's contract. Id. at 116, 402 P.2d 541 ; see also Fields , 234 Ariz. at 220, ¶ 27, 320 P.3d at 1166 (stating a public employee "has a right in the existing formula by which his benefits are calculated as of the time he began employment and any beneficial modifications made during the course of his employment" (citing Thurston v. Judges' Ret. Plan , 179 Ariz. 49, 51, 876 P.2d 545, 547 (1994) )). In Hall , our supreme court affirmed the continuing vitality of Yeazell , striking down a legislative increase of employees' pension plan contribution rates because it was an impermissible attempt to unilaterally and retroactively alter the terms of the public employees' contract. Hall , 241 Ariz. at 43, ¶ 28, 383 P.3d 1107.
¶26 In 1998, Arizona voters amended our state constitution to include Article 29, commonly referred to as the Pension Clause. This clause protects two related but distinct interests. Ariz. Const. art. 29, § 1. Subsection C provides that "[m]embership in a public retirement system is a contractual relationship" subject to the protections of our state constitution's Contract Clause. Id. ; see *837 Ariz. Const. art. 2, § 25. Subsection D protects against the diminishment or impairment of "[p]ublic retirement system benefits." Ariz. Const. art. 29, § 1 ; Fields , 234 Ariz. at 216-17, ¶ 7, 320 P.3d at 1162-63.
¶27 Importantly, neither the Pension Clause, the Contract Clauses, nor the common law provide an independent source of substantive rights. See Cross , 234 Ariz. at 599, ¶ 9, 325 P.3d at 1005. Therefore, public employees seeking to invoke their protection must anchor any claim in the terms of the applicable contract, or codified public employee pension plan. See id. (collecting cases). For that fundamental reason, Members are unlike the plaintiffs who succeeded in Yeazell, Fields, and Hall because the applicable pension law-the Plan-does not grant, nor has it ever granted, the right to include payouts for accrued sick leave in Members' "final average compensation."
¶28 We explained this principle in Cross , where a pension plan paid benefits to a member on terms different than those provided for in the relevant statute. Instead of calculating the member's pension benefit on his base salary, the plan decided to include his "bonuses and payments for unused vacation and sick time." Id. at 598, ¶ 3, 325 P.3d at 1004. After the plan paid him a monthly pension benefit for about eight years, the member asked the plan to recalculate his pension because of a recent settlement in unrelated litigation. Id. at ¶ 4. The plan determined it had erroneously overpaid the member, explaining he should not have received pension benefits until he ended employment and "it should not have included his bonuses and payments for unused vacation and sick pay in calculating his pension." Id. The plan decided to suspend the member's pension payments until it recouped the overpayments. Id. at 598-99, ¶ 4, 325 P.3d at 1004-05.
¶29 The superior court reversed the plan's decision, but we affirmed the plan's decision on appeal. Id. at 599, 607, ¶¶ 5, 46, 325 P.3d at 1005, 1013. We concluded that the Pension Clause and common-law principles, such as those articulated in Yeazell , did not "prevent[ ] the [p]lan from correcting an erroneously calculated pension." Id. at 599, ¶ 9, 325 P.3d at 1005. We also rejected the member's argument that the administrative acts involved in completing the retirement paperwork "created a contract that prevents the [p]lan from correcting a mistake in the amount of his pension," concluding the contract between the member and plan "guaranteed him only the pension due under the law, not something more." Id. at ¶ 13.
¶30 We reaffirm the central holding in Cross that contract principles and the Pension Clause protect only those pension terms or benefits found in the codified retirement plan. Id. at ¶ 9. Here, the Plan is codified in the Charter, which does not include accrued sick leave payouts as "final average compensation" when calculating a member's pension. Because the City erroneously included such payouts, it was allowed to correct its error and harmonize Current Employees' and Retirees' pensions with the Plan, which itself contemplates such corrective action. See Phoenix City Charter, ch. XXIV, art. II, § 36.1 (directing the Retirement Board to correct errors when "any ... error in the records of the Retirement Plan results in any person receiving from the Plan more or less than he would have been entitled to receive had the records been correct").
¶31 Members argue nonetheless that the City's longstanding administrative practice of allowing the inclusion of accrued sick leave payouts to calculate "final average compensation" is now part of their pension contracts for purposes of Yeazell . But Members have not met their burden to show this is the case. Yeazell , 98 Ariz. at 116, 402 P.2d 541. The City does not dispute that it allowed the practice to occur from 1996 until 2012; indeed, the City consistently informed employees about it and actively encouraged them to save sick leave for inclusion in their retirement benefit as "final average compensation." The City also budgeted funds for the estimated costs associated with inclusion of sick leave payouts and included information about the practice in annual reports and bond offerings. Members analogize these practices to an implied contractual principle where terms included in an employee handbook *838 may "become[ ] an offer to form an implied-in-fact contract and [are] accepted by the employee's acceptance of employment." Demasse v. ITT Corp. , 194 Ariz. 500, 505, ¶ 16, 984 P.2d 1138, 1143 (1999). Reliance on this principle is misplaced because Members do not point to any affirmative act taken by Phoenix voters that would suggest they were even aware of these actions, let alone that they authorized and approved them. City ordinances, administrative regulations or practices, collective bargaining agreements, or other implied theories of contract modification do not give rise to public retirement system benefits and pension terms that deviate from what is codified in the applicable retirement plan. Instead, the specific terms outlined in the codified retirement plan control, and it would stretch Yeazell beyond recognition to conclude otherwise.
¶32 Members also direct us to Norton v. Arizona Department of Public Safety Local Retirement Board , 150 Ariz. 303, 723 P.2d 652 (1986), where our supreme court was confronted with whether a public employee was entitled to reinstatement in the retirement system "when he [was] reemployed within two years in his former position, but which position no longer qualifie[d] for membership in the [retirement system]." 150 Ariz. at 304, 723 P.2d at 653. Although the statute at "all times" only provided that "service credits shall be reinstated," the court found that "membership in [the retirement system] logically follow[ed]" and thus, the public employee was reinstated. Id. at 305-06, 723 P.2d at 654-55. Members' suggestion that the employee in Norton "had a contractual right to reinstatement of membership based on the administrative policy in effect when he left employment" is misplaced given the employee's right to reinstatement logically followed from, and was based on, the applicable pension statute.
¶33 Nor are we persuaded by two decisions from Washington and New York, Bowles v. Washington Department of Retirement Systems , 121 Wash.2d 52, 847 P.2d 440 (1993), and Kranker v. Levitt , 30 N.Y.2d 574, 330 N.Y.S.2d 791, 281 N.E.2d 840 (1972). Insofar as they hold an administrative practice creates a protectable pension right, those cases do not reflect Arizona law. See Cross , 234 Ariz. at 599, ¶ 9, 325 P.3d at 1005 ("[The Pension Clause] and common-law contract principles ... only protect whatever pension rights [the plan member] ha[d] under applicable law."); see also Hall , 241 Ariz. at 41, ¶ 22, 383 P.3d at 1115 (explaining the "specific benefits" Yeazell protects are "the terms of the legislative enactment relating to the employees' pensions").
¶34 Any approach to interpretation of public employee pension contracts that is not firmly grounded in the language of the relevant codified enactment creates uncertainty and interferes with the parties' reasonable expectations. Public employees have a common-law and constitutional right to rely on the terms of the pension plan as it existed when they began employment. But the government (in this case, the voters) is also entitled to a reasonable degree of certainty in relying on the fixed terms of the plan. When the government knows the nature and extent of its obligations, it can perform appropriate functions needed to ensure the continuing viability of the plan. Allowing plan terms to be changed on an informal basis could undermine those functions and ultimately threaten the plan's integrity. These considerations find even more import in Arizona, where legally-authorized beneficial changes to a codified retirement plan automatically become part of the pension contract. Thurston , 179 Ariz. at 51, 876 P.2d at 547.
¶35 Maintaining fidelity to the codified terms of the retirement plan is especially appropriate here, where that plan is part of a home rule city charter. These charters command a special democratic legitimacy because constitutional procedures require they be approved both by the city's qualified electors and the Governor. See Ariz. Const. art. 13, § 2 ; Paddock v. Brisbois , 35 Ariz. 214, 220-21, 276 P. 325 (1929). Those electors have already rejected the notion that administrative practice can amend the Charter by not including it in the Charter's exclusive list of permissible amendment methods. Phoenix City Charter, ch. XXII, § 1. This makes good sense because amendment by administrative practice falls well below the kind of thorough *839 democratic processes contemplated by our state constitution. When Arizona courts have been asked to sanction an attempt to alter a charter's voter-approved text, they have refused to do so absent compliance with procedures required by both the Arizona Constitution and the charter itself. See, e.g. , Paddock , 35 Ariz. at 223-25, 276 P. 325. Phoenix voters themselves must amend the Charter if they desire to make the practice at issue in this case part of their "contract" with the City's public employees.
¶36 We therefore continue to adhere to a fundamental principle in Yeazell and its progeny-a pension term in a public employment contract must have a sound basis in the codified retirement plan. See, e.g. , Hall , 241 Ariz. at 36-37, 41, ¶¶ 4, 6, 8-9, 23, 383 P.3d at 1110-11, 1115 (holding that a legislative amendment to pension statutes-changing employee contribution rate and formula granting permanent benefit increases-violated Yeazell because the statutory pension terms in effect before the amendment were part of the employment contract and were modified without employees' assent); Fields , 234 Ariz. at 216-17, 220-21, ¶¶ 3-11, 27, 31, 320 P.3d at 1162-63, 1166-67 (holding statutorily-prescribed future increases in pension benefits were part of the employment contract, and retired judges had the right to the pension benefit increase formula found in pension statutes when they began employment); Yeazell , 98 Ariz. at 116-17, 402 P.2d 541 (holding that a pension statute in effect when police officer began employment was part of his employment contract and the city improperly modified the contract by applying a subsequent amendment of the pension statute to the officer without his assent).
¶37 In sum, we conclude that the City's adoption of Revised A.R. 2.441 to partially end the erroneous practice of including accrued sick leave payouts as "final average compensation" did not violate Yeazell , the Pension Clause, or the Contract Clauses of the Arizona and United States Constitutions. Given this conclusion, we do not address Members' remaining arguments, which ask us to consider issues not before us on appeal, such as the inclusion of other payouts (e.g., holiday and vacation pay) in a Plan member's compensation. Nor do we address Members' cross-appeal, which challenges the superior court's denial of a permanent injunction, class certification, and attorneys' fees. Moreover, the legality of the City's decision to continue the practice of including payouts for sick leave accrued before July 1, 2012 in pension calculations is not before us.
CONCLUSION
¶38 We hold that the Plan does not compel the City to include lump-sum, irregular cash payouts for accrued sick leave benefits at separation as pensionable "compensation," and the City did not violate common-law or constitutional principles by adopting Revised A.R. 2.441. We therefore reverse the superior court's judgment and remand for entry of judgment in favor of the City. Because Members have not prevailed on appeal, we deny their request for attorneys' fees and costs incurred on appeal. In our discretion, we deny the City's request for attorneys' fees but award taxable costs to the City upon its compliance with ARCAP 21.

Arizona courts have described city charters as equivalent to "a local constitution." State ex rel. Brnovich v. City of Tucson , 242 Ariz. 588, 598, ¶ 39, 399 P.3d 663, 673 (2017) ("Once adopted and approved, a city's charter is, 'effectively, a local constitution.' " (citation omitted)). Indeed, the "city charter is itself of constitutional origin," Jett v. City of Tucson , 180 Ariz. 115, 120-21, 882 P.2d 426, 431-32 (1994), because the Arizona Constitution creates the charter city alternative and authorizes adoption of charters. Ariz. Const. art. 13, § 2.

We need not address Members' remaining arguments concerning the definition of "compensation," which assume the phrase "salary or wages" is ambiguous and use secondary tools of construction. See Jett , 180 Ariz. at 119, 882 P.2d at 430 (explaining that because "[o]ur primary purpose is to effectuate the intent of those who framed the provision ... [n]o extrinsic matter may be shown to support a construction that would vary its apparent meaning" (citations omitted)).